RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0246P (6th Cir.)
File Name:  01a0246p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHNNIE WADE,

     *Plaintiff-Appellant,*

     *v.*

KNOXVILLE UTILITIES
BOARD,

     *Defendant-Appellee.*

No. 00-5210

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 98-00334—R. Leon Jordan, District Judge.

Argued:  June 6, 2001

Decided and Filed:  July 30, 2001

Before:  GUY, BOGGS, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  George T. Underwood, Jr., THE LAW OFFICE
OF GEORGE T. UNDERWOOD, Knoxville, Tennessee, for
Appellant.  Adrienne L. Anderson, KRAMER, RAYSON,
LEAKE, RODGERS & MORGAN, Knoxville, Tennessee,
for Appellee.  **ON BRIEF:**  George T. Underwood, Jr., THE
LAW OFFICE OF GEORGE T. UNDERWOOD, Knoxville,

1

Tennessee, for Appellant. Adrienne L. Anderson, Edward G. Phillips, KRAMER, RAYSON, LEAKE, RODGERS & MORGAN, Knoxville, Tennessee, for Appellee.

_____

## OPINION
_____

RALPH B. GUY, JR., Circuit Judge.  Plaintiff, Johnnie Wade, appeals from the entry of summary judgment in favor of his former employer, the Knoxville Utilities Board (KUB), on his claims of racial discrimination and retaliation in violation of 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e; and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101. Plaintiff also contends that the district court abused its discretion by denying his motion to amend the complaint to add new claims for disability discrimination, race discrimination, and retaliatory discharge. After careful review of the record and the arguments presented on appeal, we find no error and affirm.

### I.

Plaintiff, an African-American male, was hired into KUB's four-year lineman apprentice program in October 1990. Although he was promoted to a second-year apprentice position, plaintiff and several others were notified in October 1992 that they would not be promoted to a third-year position because of poor attendance and other problems.  In January 1993, plaintiff injured an ankle when he was hit with an electric cart driven by another employee.    Although defendant's investigation was unable to substantiate the claim, plaintiff believed that the accident was intentional and racially motivated.

Upon his return to work in April 1993, plaintiff exhibited behavior that caused KUB to be concerned about his mental condition.  Plaintiff was referred to Dr. Jeff Greenwood, a psychiatrist, for counseling.   Dr. Greenwood diagnosed

shown between the prior EEOC charges and Noe's response to the inquiry from Boeing.[7]

### 3.    THRA and § 1981 Claims

The district court also granted summary judgment to defendant on plaintiff's claims of race discrimination and retaliation brought under the THRA and § 1981.  First, as the district court observed, these claims are governed by the same burden-shifting standards as the claims under Title VII.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Raines v. Shoney's, Inc.*, 909 F. Supp. 1070 (E.D. Tenn. 1995); *Bruce v. W. Auto Supply Co.*, 669 S.W.2d 95 (Tenn. Ct. App. 1984).  As a result, the analysis and conclusions concerning the Title VII claims discussed above apply equally to the parallel claims brought under the THRA and § 1981.

Moreover, plaintiff's THRA and § 1981 claims were time barred.  Claims brought under the THRA are subject to the one-year limitations period set forth in Tenn. Code Ann. § 4-21-311.  *See Weber*, 938 S.W.2d at 389-90.  Because § 1981 does not specify a statute of limitations, we apply the one-year limitations period from Tenn. Code Ann. § 28-3-104.  *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 578 (6th Cir. 1992).  Since neither period is tolled by the filing of the administrative claims with the EEOC, these claims accrued more than one year before the complaint was filed on June 2, 1998.

**AFFIRMED.**

---

[7]Beyond this conclusion, the district court also observed that: "Wade signed a release regarding Boeing's acquisition of information in connection with his employment application which holds former employers harmless except for misrepresentation"; "Wade provided less than truthful information on the application concerning his mental condition and use of prescribed medications"; and, "Boeing could have withdrawn its conditional job offer for several reasons unrelated to any statements by KUB."

plaintiff as suffering from  paranoia, treated him with anti-psychotic medication, and excused him from work.  On April 19, 1993, plaintiff filed the first of three charges with the EEOC.  This charge alleged race discrimination and harassment during his employment, including incidents of racially offensive language and fliers, derogatory comments and pranks, and the denial of training and promotions.

After being released to work by Dr. Greenwood, plaintiff returned to KUB on May 4, 1993.  Plaintiff's behavior that day and the next concerned his supervisor and led to a leave of absence to continue treatment.  In June 1993, Dr. Greenwood reported that plaintiff had responded to medication and could return to work as a lineman apprentice.  He also indicated that plaintiff was taking 10 mg. of Stelazine at bedtime, which "may have some subtle sedative side effects," but that plaintiff had "no apparent impairment from his medication and may work in his former sensitive job on high power lines."

KUB requested a fitness-for-duty evaluation.  Dr. Kenneth Carpenter, a board-certified psychiatrist, diagnosed plaintiff as having Schizophreniform Disorder and Paranoid Personality.  He observed that plaintiff had difficulty with thinking and concentration, as well as continued feelings of persecution, and recommended that he be placed on a different work crew in a less safety-sensitive position for six months.  Plaintiff, who was represented by counsel at the time, asked for a third opinion.  The third doctor concluded that plaintiff should not work with high voltage while taking the medication.  Plaintiff was offered other work in the Properties Department, which he viewed as a demotion and refused.

In November 1993, Dr. Greenwood removed plaintiff from the medication and released him to work.  Plaintiff returned to work as a second-year lineman apprentice and was promoted to a third-year position in February 1994.  Over the next several months, however, Bill Norton, the manager of

the program, received verbal reports of several near accidents that were attributed to plaintiff's mental lapses or inattention.

In July 1994, Norton consulted with Dr. Carpenter about plaintiff, who concluded that plaintiff should not remain in the lineman program but could handle a less safety-sensitive position in the meter tester apprentice program. Plaintiff was offered a transfer to a meter tester position, in the final year of the three-year program, with no loss of pay. To accomplish the transfer without bidding the position, the transfer was specifically requested and granted as an accommodation under the Americans with Disabilities Act (ADA). In September 1994, the EEOC issued its determination that there was no evidence of discrimination. Notably, this determination concerned plaintiff's claims up to and including the transfer to the meter tester program. Plaintiff, however, did not file suit within 90 days.

Plaintiff worked in the meter tester apprentice program until March 27, 1995. On that day, plaintiff was asked to meet with Everett Noe, Manager of the Electric Meter Department, and Dennis Upton, Human Resources Manager, concerning complaints from several female coworkers that plaintiff's interactions made them feel uncomfortable. KUB considered the meeting to be a counseling session, not a disciplinary action, as no formal complaint had been filed. Plaintiff became agitated, demanded to know who had complained, and denied that he had harassed anyone. Plaintiff says Upton told him to "sit down and shut his damn mouth," while Upton claims he said he could not reveal the names because "it's the damn law."[1]

Shortly after the meeting ended, plaintiff met Noe and Upton in the hallway and called Upton an "Uncle Tom." Upton, who is also African-American, called plaintiff back into his office, accused him of being insubordinate and, when

---

[1]Plaintiff argues that these false accusations were made because of race and retaliation in order to prevent him from completing the meter tester apprentice program and achieving civil service protection.

*Bottlers of Toledo, Inc.*, 783 F.2d 50 (6th Cir. 1986) (a time span of more than one year from the filing suit to the firing militated against finding that discharge was retaliatory). Much of Wade's response to the motion is comprised of conclusory allegations and his perceptions which are not sufficient to stave off summary judgment. *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 871 (1st Cir. 1997). Wade's subjective assessment is not evidence. *Id*.

The district court's decision is also supported by evidence that plaintiff was approved for long-term disability benefits shortly after he filed the second EEOC charge in June 1995. In addition, those benefits were not terminated after the second right-to-sue letter was issued in April 1997.

Plaintiff emphasizes that the letter accompanying KUB's formal notice of termination was written on the same date that the EEOC issued the second right-to-sue letter. It is undisputed, however, that KUB made the decision to terminate plaintiff's employment before the right-to-sue letter was issued. The other evidence of retaliatory intent that plaintiff points to is the statement from Upton on March 27, 1995, to the effect that plaintiff's refusal to apologize for the "Uncle Tom" comment would "have consequences." Since Upton viewed the comment as insubordination, it is not surprising that he might threaten disciplinary action. Nonetheless, consequences were threatened in March 1995, before plaintiff filed the second EEOC charge in June 1995. While the question of possible disciplinary action for that statement was included as the last of the conditions required before plaintiff could return to work, that does not suggest a connection between the filing of EEOC charges and the decision not to permit plaintiff to return to work.

Finally, plaintiff alleges that his conditional offer of employment from Boeing was sabotaged by defendant in retaliation for having engaged in protected activity. We agree with the district court that there was no causal connection

discharged or not returned to work because of race discrimination.[6]

Next, to demonstrate a *prima facie* case of retaliation, plaintiff must show that (1) he was engaged in activity protected by Title VII, (2) the activity was known to the defendant, (3) he was subjected to tangible employment action, and (4) there is a causal link between the protected activity and the adverse employment action. *See Johnson v. Dep't of Health and Human Servs.*, 30 F.3d 45, 47 (6th Cir. 1994). The evidence must be sufficient to raise an inference that the protected activity was the likely reason for the adverse action. *See Walborn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998).

With respect to the decision to terminate plaintiff's employment, the district court correctly concluded that plaintiff had not shown a causal connection between the termination and the prior EEOC charges. The district court explained:

> There is no direct evidence in the record or evidence to raise an inference that Wade's termination in February 1997 was connected with the EEOC charges he filed in 1993 and 1995. Subsequent to filing the first charge, Wade was advanced to the third year lineman apprentice position and later was given an accommodation by being transferred to the meter testing program. The number of years between the first two EEOC charges and the discharge in February 1997 militate against a finding that the discharge was retaliatory in nature. *See, e.g., Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., a Div. of RKO*

---

[6] Taking the matter to the next step, the district court also found that plaintiff failed to raise a jury-submissible issue on the question of whether the defendant's reasons were merely pretext for race discrimination. *See Manzer*, 29 F.3d at 1084. Without repeating the district court's reasoning, we agree that plaintiff failed to present evidence to suggest that the defendant's reasons (1) lacked a factual basis, (2) did not actually motivate the decision, or (3) were insufficient to motivate the decision.

plaintiff would not apologize, suspended plaintiff with pay for the rest of the day. When they spoke by telephone later in the day, plaintiff refused to apologize. The next day, March 28, 1995, plaintiff was seen in the emergency room of a local hospital. According to Dr. Greenwood, plaintiff was psychotic and refused medication. As a result, plaintiff was involuntarily committed to a psychiatric hospital for treatment.

On June 4, 1995, plaintiff filed his second EEOC charge, alleging that he was falsely accused of sexual harassment in retaliation for filing the first EEOC charge. Several weeks later, plaintiff was approved by KUB to receive long-term disability benefits. Dr. Greenwood reported to KUB that plaintiff had schizophrenia with progressive decline and appeared to be permanently disabled. In October 1995, Dr. Greenwood indicated that plaintiff should apply for social security benefits. The district court noted that plaintiff was receiving social security benefits for his mental condition.

Plaintiff had no further contact with KUB until December 1996, when he asked to return to work. He presented a letter from Dr. Greenwood dated December 18, 1996, which stated: "From his appearance today [plaintiff] seems able to return to work at some capacity, though his illness has been recurrent and may require future periods of absence when symptoms might recur." However, a handwritten note at the bottom of the letter written by another doctor said that Dr. Greenwood had released plaintiff to return to his former job with no restrictions. Dr. Greenwood testified that the handwritten note, made by another doctor who had not treated plaintiff, did not comport with his opinion at the time.

KUB responded to plaintiff's request in a letter dated December 30, 1996, which outlined several conditions that would have to be met before plaintiff could return to work. The conditions included: (1) that plaintiff submit to a fitness-for-duty psychological examination by Dr. Carpenter; (2) that KUB complete its review of allegations of possible criminal conduct by plaintiff; (3) that plaintiff agree to complete

additional course work that had been added to the meter tester program during his absence; and (4) that, if the other conditions were met, plaintiff meet with Upton to discuss disciplinary action for his conduct on March 27, 1995.[2]

Dr. Carpenter conducted a fitness-for-duty evaluation in January 1997 and concluded that plaintiff should not be returned to the ongoing stress of a work environment. He observed that plaintiff was not taking his medication and opined that there was a "great likelihood that Mr. Wade will have more striking irrational behavior as time goes on." Dr. Carpenter also indicated that plaintiff's "extreme guardedness and vague thinking make him difficult to work with" and that, "with the stress back on the job, his symptoms will intensify and there will be further problems." Dr. Greenwood testified that he did not disagree with any of the conclusions in Dr. Carpenter's report.[3]

Based principally on Dr. Carpenter's report, KUB decided not to have plaintiff return to work. On February 26, 1997, KUB representatives advised plaintiff and his attorney that plaintiff could not return to work, but would remain on inactive status until he was no longer eligible for long-term disability benefits. Plaintiff was also advised that his

_____

[2] The investigation into allegations of criminal activity was prompted by an alert from the TVA Employees Credit Union that plaintiff might be involved in a credit-card scam. KUB had a private investigator look into the allegation, but the evidence was inconclusive. On appeal, plaintiff argues that KUB unfairly investigated allegations of criminal activity on his part and included as a condition for his return to work that KUB complete its review of those allegations. The evidence submitted in this regard does not show or permit an inference that KUB unjustly or inappropriately looked into the conduct that was brought to its attention by the credit union. Nor was there evidence to suggest that the investigation was related to or the cause of plaintiff's discharge.

[3] Plaintiff contends that KUB violated its own policy by failing to obtain a third opinion concerning his ability to return to work. The language plaintiff relies on, however, pertains to the determination of eligibility for long-term disability benefits and not fitness to return to work.

good progress. However, Blevins' experience working with Wade was prior to Wade's involuntar[y] commitment to a psychiatric hospital and almost two years of disability leave for paranoid schizophrenia. It was also prior to the fitness for work examination by Dr. Carpenter. Blevins' experience with Wade and his evaluation of Wade's performance prior to these significant events has no bearing on the issue of Wade's status and ability to perform in December 1996. Under these circumstances, whether Wade is "qualified" for the meter testing apprentice position is not a question of skill but the ability to function on the job by performing the work and dealing with the stress, coworker interaction, and supervision attendant to the job.

It is clear that Dr. Greenwood's letter in December 1996 stating that plaintiff could return to work "at some capacity" represents a somewhat inconsistent position from the opinions he expressed while Wade was on disability leave. KUB was justified based on all the circumstances and its own policy to require Wade to undergo a fitness for work examination.

Plaintiff offered no evidence to contradict the opinion of Dr. Carpenter, nor did plaintiff offer other evidence "to show that he would be able to handle the stress of returning to work, dealing with coworkers, and accepting supervision and constructive criticism." The district court concluded that, "[c]onsidering all of the facts and circumstances, this evidence demonstrates that Wade could not perform the essential functions of the meter testing apprentice position and could not meet the reasonable expectations KUB would have for a person in that position." *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999). Reviewing the question *de novo*, we agree that plaintiff failed to make a *prima facie* showing that he was

burden of persuasion rests with plaintiff to prove that the proffered reasons were a pretext for discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

The district court found that plaintiff had not made a *prima facie* showing of race discrimination because he was not qualified to return to work as a meter tester apprentice.  When plaintiff asked to return to work in December 1996, he had been on disability leave for about 20 months.  Accepting the genuineness of plaintiff's request, KUB required that certain conditions be met before he could return to work.  The first and foremost of these conditions was that plaintiff be evaluated by Dr. Carpenter, who concluded that plaintiff should not be returned to the ongoing stress of a work environment.  Plaintiff makes much of the fact that a jury found against Dr. Carpenter in an unrelated malpractice action arising out of an evaluation performed on behalf of an employer.  As the district court correctly observed, that fact has no bearing in this case.  This is particularly true since Dr. Greenwood did not disagree with Dr. Carpenter's conclusions, and no contrary opinions were offered concerning plaintiff's ability to return to work.

Plaintiff argues that he was qualified to work in the meter tester program because KUB had placed him there in July 1994, and he had performed satisfactorily until going on leave in March 1995.  The district court addressed this argument and distinguished between plaintiff's skill and his ability to function on the job.

Wade argues that KUB transferred Wade to the meter testing program so it cannot argue he is not qualified.  Wade also points to the testimony of Don Blevins ("Blevins") who was his supervisor in the meter testing apprentice program as support for his contention that he was qualified for the job.  Blevins testified that he never had a problem with Wade and that Wade was able to perform the work testing the meters and was making

employment would be terminated as of June 30, 1997.  Although KUB scheduled a due process pre-termination hearing, neither plaintiff nor his attorney attended.  KUB prepared a notice of termination and cover letter dated April 11, 1997, but was unable to serve plaintiff personally.  Plaintiff agreed to meet with Upton and Noe on April 15, 1997, but before they could give him the papers, plaintiff fell from the chair to the floor and claimed to have injured his back.  Plaintiff filed a worker's compensation claim for the fall, which KUB contested.[4]  On April 11, 1997, the EEOC issued a right-to-sue letter on plaintiff's second EEOC charge, but plaintiff did not file suit within 90 days.

Plaintiff also claims that KUB sabotaged an offer of employment he received from Boeing, and that KUB did so in retaliation for his having filed complaints with the EEOC.  Plaintiff received a contingent offer of employment from Boeing on June 23, 1997.  After someone at Boeing contacted KUB for a reference check, the offer was withdrawn.  Noe testified that someone from Boeing called him in July 1997 to ask about plaintiff's employment.  Noe said plaintiff no longer worked at KUB.  When asked why, Noe said plaintiff had been out of work for a great length of time, and they decided not to bring him back.  Boeing withdrew the offer based in part on information received during its reference check, but indicated a willingness to reconsider if plaintiff could verify that his separation was voluntary and not for cause.

On August 14, 1997, plaintiff filed his third complaint with the EEOC, charging that he was harassed and discharged because of disability and race, and that he was retaliated against for filing EEOC charges.  On March 5, 1998, the EEOC issued a right-to-sue letter. Plaintiff commenced this action on June 2, 1998, within the 90-day limitations period.

---

[4]In 1999, based on information pertaining to the worker's compensation claim, KUB had a private investigator check whether plaintiff was playing on a basketball team despite his claimed back injury.  Plaintiff asserts that this was evidence of continued harassment.

The complaint alleged that KUB engaged in a pattern and practice of racial discrimination, maintained a racially hostile work environment, and retaliated against plaintiff for filing complaints of discrimination with the EEOC.

On November 23, 1999, about three weeks before the dispositive motion cut-off date, plaintiff filed a motion to amend the complaint to add claims for disability discrimination pursuant to the ADA, *see* 42 U.S.C. § 12101; Section 504 of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794; and the Tennessee Handicap Act (THA), *see* Tenn. Code Ann. § 8-50-103. The proposed amended complaint alleged new claims of race discrimination under Title VI of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000d, and retaliatory discharge under the whistleblower provisions of the Tennessee Public Protection Act (TPPA), *see* Tenn. Code Ann. § 50-1-304. Plaintiff also filed a motion for partial summary judgment in his favor on the ADA claims, while defendant filed a motion for summary judgment on the race and retaliation claims asserted in the original complaint.

On January 18, 2000, the district court denied plaintiff's motion to amend the complaint. As a result, plaintiff's motion for partial summary judgment was also denied. The district court then granted defendant's motion for summary judgment for the reasons set forth in its opinion filed January 31, 2000. This timely appeal followed.

## II.

### A.  Motion to Amend

Under Fed. R. Civ. P. 15(a), leave to amend a pleading shall be freely given "when justice so requires." Several factors should be considered in determining whether to grant a motion to amend.

Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of

Plaintiff argues that the time for filing suit after his receipt of the second right-to-sue letter in April 1997 should be tolled because he was on disability leave from March 1995 until his discharge. This, plaintiff contends, raises at least a question of fact under Tenn. Code Ann. § 28-1-106, which serves to toll the statute of limitations when a person entitled to commence an action is "of unsound mind" at the time the cause of action accrued. This tolling provision has no application to the Title VII claims, however, as we have held that state law tolling or savings provisions do not apply to the limitations periods expressly set forth in Title VII. *See Clark*, 1998 WL 786892, at *3 (citing *Johnson v. Ry. Express Agency, Inc.*, 489 F.2d 525, 530 (6th Cir. 1973) (rejecting application of Tennessee savings statute to 90-day period under Title VII)).[5]

### 2.    Title VII Race and Retaliation Claims

To establish a *prima facie* case of race discrimination, plaintiff must show that he (1) was a member of a protected class, (2) was qualified for the position, (3) was discharged, and (4) was replaced by a person outside the protected group. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Once a *prima facie* showing is made, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for its decision. The ultimate

---

[5]Moreover, under Tennessee law, the plaintiff bears the burden of proving the injured party was of unsound mind during the *entire time* in question. *See Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn. Ct. App. 1978). To be of "unsound mind," Tennessee law requires that one be incapable of attending to any business or taking care of himself. *See Smith v. Grumman-Olsen Corp.*, 913 F. Supp. 1077, 1085 (E.D. Tenn. 1995). The first right-to-sue letter, which was issued in September 1994, preceded the plaintiff's disability. The second letter, issued in April 1997, was followed by plaintiff's application for employment with Boeing and the filing of the third EEOC charge in August 1997. While defendant did not dispute plaintiff was disabled from work, the psychiatric evaluations did not suggest that plaintiff's mental condition rendered him unable to attend to any business or take care of himself. Plaintiff offered no other evidence on this issue.

or the second right-to-sue letter. The first EEOC determination addressed plaintiff's claims of racial harassment, the initial failure to promote him to a third-year lineman apprentice position, and the later ADA-transfer into the meter tester apprentice program. The second right-to-sue letter pertained to plaintiff's charges of retaliation. Since plaintiff was on disability leave beginning in late March 1995, he cannot claim he was subjected to a hostile work environment during the relevant time period. Thus, all plaintiff's race and retaliation claims were time barred, except for claims based on KUB's decision to terminate plaintiff's employment and the post-termination response to Boeing's reference check.

Plaintiff sought to resurrect the earlier claims under a continuing violation theory, which the district court properly rejected. As we have explained, the continuing violation doctrine may serve to toll the statutory period within which to file a complaint with the EEOC. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977); *Dixon v. Anderson*, 928 F.2d 212, 216-17 (6th Cir. 1991). The continuing violation doctrine, however, does not relieve a plaintiff of the need to file an action within 90 days of receiving the right-to-sue letter. *See Clark v. Nissan Motor Mfg. Corp. U.S.A.*, No. 97-5956, 1998 WL 786892, at *5 (6th Cir. Oct. 26, 1998) (unpublished decision) (citing *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 962 (10th Cir. 1991)). Plaintiff has abandoned the continuing violation argument on appeal.

The district court nonetheless recognized that the 90-day filing requirement is not jurisdictional and may be subject to equitable tolling in exceptional circumstances. *See Truitt v. County of Wayne*, 148 F.3d 644, 646-47 (6th Cir. 1998). After considering the relevant factors, the district court concluded that equitable tolling would not be appropriate in this case. Plaintiff does not challenge this finding on appeal. Instead, plaintiff amplifies a tolling argument raised by counsel during the hearing on defendant's motion for summary judgment.

amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989) (quoting *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973)). *See also Coe v. Bell*, 161 F.3d 320, 341-42 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999). When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999). The denial of a motion for leave to amend is reviewed for abuse of discretion, except to the extent that the decision is based on a legal conclusion that the amendment would not withstand a motion to dismiss. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000), *cert. denied*, __ S. Ct. __, 2001 WL 476556 (U.S. June 29, 2001); *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986).

The district court considered the appropriate factors and gave its reasons for denying the motion to amend. Plaintiff offered no explanation or justification for having waited a year and a half before filing the motion to amend to add the disability discrimination claims, the retaliatory discharge claim under the TPPA, or the claim of race discrimination facilitated by federal funds in violation of Title VI. Since the third EEOC charge complained of disability discrimination as well as race discrimination and retaliation, plaintiff was aware of his claims for disability discrimination. Nonetheless, the complaint, which was filed with the assistance of counsel and signed by plaintiff personally, did not claim adverse treatment because of disability. The complaint did not put defendant on notice that it would have to defend claims of discrimination based on disability, and discovery was conducted accordingly.

Recognizing that delay alone was not sufficient reason to deny the amendment, the district court also found that

to allow the amendments proposed by plaintiff would result in significant prejudice to the defendant. The dispositive motion deadline has already past, and defendant has filed a motion for summary judgment on all claims alleged in the original complaint. It is also apparent that significant discovery has been completed including more than 20 depositions. Obviously, some if not all of the depositions already taken would have to be supplemented to address the multiple issues raised in the proposed amendments and other extensive and additional discovery would have to be undertaken as well. In addition, defendant would have to prepare a defense for the newly asserted claims that likely would require securing new medical and expert witnesses.

Plaintiff argues that he should have been permitted to add the disability discrimination claims because they would relate back to the filing of the original complaint. *See Spillman v. Carter*, 918 F. Supp. 336 (D. Kan. 1996). The district court did not disagree. Rather, in the exercise of its discretion, the court determined that justice did not require that leave be granted on the disability claims. We find no abuse of discretion in this regard. Even on appeal, plaintiff fails to offer any explanation or justification for the lateness of the motion to amend. Nor does plaintiff dispute the finding of prejudice to the defendant that would result if plaintiff had been allowed to add the disability discrimination claims at that stage of the proceedings.

The district court also concluded that the amendment would be futile with respect to the TPPA and Title VI claims because they would be barred by the applicable statutes of limitations. The retaliatory discharge claim under the TPPA is governed by a one-year statute of limitations and accrues when the plaintiff knew or should have known that an injury had been sustained. *See Weber v. Moses*, 938 S.W.2d 387, 393 (Tenn. 1996). The period commenced when plaintiff "received unequivocal oral notice" of the decision to terminate his employment. *Id.* at 388. In this case, plaintiff was advised of KUB's decision in February 1997 and was

served with written notice of termination in April 1997. Thus, even if the claim related back to the filing of the original complaint, it accrued more than a year before the original complaint was filed.

Similarly, the race discrimination claim under Title VI is governed by the one-year limitations period set forth in Tenn. Code Ann. § 28-3-104(a)(3) for civil actions brought under federal civil rights statutes. *See Simmons v. Middle Tenn. State Univ.*, No. 95-6111, 1997 WL 400105, at **2-3 (6th Cir. Jul. 11, 1997) (unpublished decision). Since plaintiff was not required to exhaust administrative remedies before bringing a Title VI claim, the limitations period was not tolled during the pendency of the administrative proceedings. *Id. See also Del. State Coll. v. Ricks*, 449 U.S. 250, 261 (1980). Even under the *de novo* review required with respect to a finding of futility, plaintiff has failed to demonstrate any error by the district court with respect to these claims.

## B.   Motion for Summary Judgment

We review *de novo* the district court's grant of summary judgment. *See, e.g., Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986).

### 1.   Timeliness of Title VII Claims

Although plaintiff alleged race discrimination and retaliation claims reaching back to the start of his employment with KUB, the district court found that Title VII claims arising more than 300 days before plaintiff's filing of the third EEOC charge on August 14, 1997, were time barred. Claims based on earlier conduct were barred because plaintiff failed to file an action within 90 days after receiving either the first