**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0970n.06

No. 11-6259

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Sep 04, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CALVIN WILHITE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United |
| | ) | States District Court for the |
| CORRECTIONS CORPORATION OF AMERICA; | ) | Western District of Tennessee |
| HARDEMAN COUNTY CORRECTIONAL | ) | |
| FACILITIES CORPORATION; JOE EASTERLING, | ) | |
| Warden, Individually and in his official capacity as | ) | |
| Warden of Hardeman County Correctional Facility; | ) | |
| JERMAINE HUGELEY; JANE DOE 1; GUARD 1; | ) | |
| JANE DOE 2; GUARD 2; JANE DOE 3; GUARD 3 | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: COOK and STRANCH, Circuit Judges, and STAMP, District Judge.[*]

FREDERICK P. STAMP, JR., Senior District Judge. Plaintiff-appellant Calvin Wilhite ("Wilhite" or "plaintiff") appeals from the final order of the United States District Court for the Western District of Tennessee, Eastern Division, granting judgment in favor of the defendants-appellees and denying the plaintiff-appellant's motion to reconsider the order granting summary judgment in favor of defendants Corrections Corporation of America ("CCA"), Joe Easterling ("Easterling"), and Hardeman County Correctional Facilities Corporation ("HCCFC"). The plaintiff

---

[*]The Honorable Frederick P. Stamp, Jr., Senior United States District Judge for the Northern District of West Virginia, sitting by designation.

also appeals the district court's order dismissing his claims against defendant Jermaine Hughey ("Hughey").

## I.  BACKGROUND

This lawsuit arose out of an incident that occurred while Wilhite was incarcerated at Hardeman County Correctional Facility ("HCCF"), which is run and managed by CCA.  On November 9, 2007, Wilhite was physically assaulted by his cell mate, Hughey.  Once help arrived at the facility, Wilhite was transported to the Regional Medical Center at Memphis, Tennessee ("the MED") to receive medical attention.  The assault resulted in severe trauma to Wilhite's head, including thirteen broken bones in his face.  Following treatment by the MED's trauma unit, Wilhite was transferred to Nashville General Hospital on or about November 17, 2007.  On or about January 8, 2008, Wilhite was then released to the Deberry Special Needs Facility ("Deberry") with the Department of Corrections.  On April 2, 2008, Wilhite was then transferred to Building 15B for housing.  He did not return to HCCF until June 2008, after spending over seven months in hospitals. Wilhite claims that from approximately November 9, 2007, the date of the incident, through April or May 2008, he was not mentally competent, of sound mind, or aware of the events that took place on the day of the assault.[1]

While at Deberry, Wilhite was treated by two doctors: (1) Dr. Maduueze Nwozo, a board-certified physician in internal medicine; and (2) Dr. Amin Azimi, the Director of Psychology at

---

[1]The plaintiff claims that he did not learn of the events that caused his injuries until he returned to HCCF in June 2008.

Deberry. On April 2, 2008, after weeks of treatment and follow-up consultations with the oral surgeon, Dr. Nwozo dictated a discharge summary for the plaintiff finding him to be medically stable. After conducting a mental screening of the plaintiff, Dr. Azimi observed that Wilhite was competent to carry on a conversation and that there were no major issues that required follow-up.

On April 1, 2009, the plaintiff filed a complaint in the district court pursuant to 42 U.S.C. § 1983 and Tennessee law against CCA, the State of Tennessee, HCCFC, Easterling, individually and in his official capacity as Warden of HCCF, Hughey,[2] Jane Doe 1, Guard 1, Jane Doe 2, Guard 2, Jane Doe 3, and Guard 3.[3] On June 15, 2009, defendants CCA, HCCFC, and Easterling filed a motion to dismiss. In support of their motion to dismiss, the defendants argued that the complaint was time-barred. The plaintiff filed a response to the motion to dismiss on July 15, 2009. Subsequently, the court entered an order granting the defendants' motion to stay the proceedings and allowing limited discovery. During this discovery period, the parties conducted depositions of the plaintiff's treating physicians at Deberry. On February 26, 2010, the district court dismissed the plaintiff's claims against CCA, Easterling, and HCCFC, stating that the plaintiff was not under a disability in April 2008, thus the filing of the complaint was not timely.[4] The plaintiff then filed a motion to reconsider the order granting the motion for summary judgment. The court entered an

---

[2]This defendant was misidentified in the complaint as Jermaine Hugeley.

[3]Pursuant to a consent notice of nonsuit by the plaintiff, the district court dismissed the claims against the State of Tennessee without prejudice on June 30, 2009.

[4]Because the parties submitted affidavits and other documents for the court's review, the district court converted the defendants' motion to dismiss into a motion for summary judgment.

order denying the motion to reconsider on June 29, 2010. Also on June 29, 2010, the unnamed defendants were dismissed without prejudice.

On July 16, 2010, the court issued an order to show cause why the claims against defendant Hughey should not be dismissed for failure to prosecute. The plaintiff filed a motion for entry of default on August 4, 2010, and consequently, the clerk entered default as to defendant Hughey on August 6, 2010. On August 19, 2010, the plaintiff filed a motion for default judgment as to Hughey, which was referred to United States Magistrate Judge Edward G. Bryant. On September 7, 2010, Hughey filed a motion to dismiss, in which he asserted that the plaintiff's claim is time-barred by the statute of limitations. On September 9, 2010, the magistrate judge issued a report and recommendation recommending that the plaintiff's motion for default judgment be denied. On September 28, 2010, the court entered an order adopting the report and recommendation of the magistrate judge and denying the plaintiff's motion for default judgment against Hughey. On September 8, 2011, the court entered an order of dismissal and judgment in a civil case, dismissing all claims by the plaintiff against defendant Hughey.

The plaintiff now appeals the district court's decisions granting the defendants' motion for summary judgment, denying his motion for reconsideration, and dismissing his claims against Hughey.[5] The plaintiff avers that the district court erred in assuming that he was mentally competent

---

[5]The plaintiff has previously filed a notice of appeal with regard to the order denying his motion for reconsideration. However, this Court dismissed that appeal due to the fact that at that time, there was no final judgment.

to understand his injuries and how they occurred as of March 31, 2008, under the disability doctrine found at Tenn. Code Ann. § 28-1-106.

## II. ANALYSIS

The central issue on appeal is whether the district court erred in dismissing the plaintiff's claims based upon the fact that his cause of action was time-barred. In answering this question, we must consider whether the district court correctly determined that the plaintiff's disability was removed more than one year before the filing of his complaint. For the reasons stated below, we find that the plaintiff's claims were properly dismissed, as he has not offered evidence to support that he was under any disability at the time his cause of action accrued such that would toll the statute of limitations.

The statute of limitations applicable to an action brought under § 1983 alleging a violation of civil rights or personal injuries is the state statute of limitations applicable to personal injury actions under the law of the state where the § 1983 claim arises. *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In this case, Tennessee's one-year limitations period for actions brought under federal civil rights statutes or for personal injuries applies. Tenn. Code Ann. § 28-3-104; *Arauz v. Bell*, 307 F. App'x 923, 927 (6th Cir. 2009). "Federal law determines when the statute of limitations begins to run, and under federal law, 'the statute of limitations begins to run when the plaintiff knows or has reason to know of the injury which is the

basis of his action.'" *Arauz*, 307 F. App'x at 927-28 (quoting *McCune v. City of Grand Rapids*, 842 F.2d 903, 905 (6th Cir. 1988)).

Under Tennessee law, the statute of limitations for a personal injury cause of action may be tolled if an individual is under a disability such as unsoundness of mind. *See* Tenn. Code Ann. § 28-1-106. A party seeking to invoke the operation of this tolling statute must allege sufficient facts to show that it applies. "[T]he modern test for determining whether an individual is of 'unsound mind' for purposes of section 28-1-106 is whether that individual was unable to manage his or her day-to-day affairs at the time the cause of action accrued." *Sherrill v. Souder*, 325 S.W.3d 584, 601 (Tenn. 2010); *see also Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 461 n.5 (6th Cir. 2001) ("To be of 'unsound mind,' Tennessee law requires that one be incapable of attending to any business or taking care of himself."). "The focus of the inquiry under section 28-1-106 should be on a plaintiff's mental capacity to understand his or her legal rights and responsibilities, including the cause of action that has accrued." *Sherrill*, 325 S.W.3d at 601. A plaintiff seeking to toll the statute of limitations bears the burden of proving that he was of unsound mind during the entire time in question. *Wade*, 259 F.3d at 461 n.5.

In his complaint, the plaintiff states that he "was not mentally competent, of sound mind, or aware of the events that conspired on or about November 8 or 9, 2007 until April or May 2008." Compl. ¶ 32. In his response to the defendants' motion to dismiss, Wilhite reasserts that he had no memory or knowledge of the events surrounding his injuries until he returned to HCCF in June 2008. In support of this contention, the plaintiff stated that from November 2007 through June 2008, he

6

was on "numerous pain medications, rendering him unconscious and unable to comprehend what was going on around him." According to the plaintiff, his state of being either highly medicated or unconscious rendered him mentally incompetent during this time, thus, the statute of limitations did not begin to run until April 2008.

The plaintiff now argues that the district court improperly relied upon the medical records of his Deberry physicians, which he claims are incomplete and unreliable. The plaintiff points to alleged inconsistencies between the documented dates in his medical records where he refused a dental soft diet and Dr. Nwozo's testimony regarding his consultation with the plaintiff regarding the dental soft diet.[6] The plaintiff also argues that Dr. Nwozo did, in fact, have personal knowledge of his required pain medication, but failed to make a notation of this in the medical record. The plaintiff does not, however, explain how Dr. Nwozo allegedly acquired this personal knowledge. Instead, the plaintiff seems to suggest that Dr. Nwozo should have assumed that he was on pain medication because his jaw was wired shut.

Turning to Dr. Azimi's mental evaluation, the plaintiff argues that the brief meeting conducted through a screen door, rather than face-to-face, was insufficient to enable the doctor to determine the plaintiff's mental state. The plaintiff highlights Dr. Azimi's deposition testimony, in which the doctor stated that he did not question the plaintiff as to what he had been treated for, and

---

[6]Wilhite signed Refusal of Medical Services forms on February 25, 2008, and on March 2, 2008. Wilhite argues that Dr. Nwozo reviewed the form with him only after he had signed it, but Dr. Nwozo testified that he discussed Wilhite's refusal of the soft diet with him on the dates that both forms were signed. Nwozo Dep. 24:8-11; 25:19-22, Oct. 30, 2009.

he acknowledged that he had no way of knowing whether the plaintiff was correctly answering his questions.

Even assuming, as the district court did, that Wilhite was incompetent during his hospitalization, we agree that he was no longer disabled as of March 31, 2008–one year prior to the filing of his complaint. Although the plaintiff alleges that he was of unsound mind until either April or June 2008, he fails to present evidence supporting such a finding. Indeed, the deposition testimony of the Deberry physicians suggests otherwise. On multiple occasions, Wilhite signed documents refusing the dental soft diet, despite having been warned by Dr. Nwozo prior to signing of the risks of eating a regular, or hard diet, while his jaw was wired shut. Nwozo Dep. 23:16-24; 24:1-24; 26:1-10. During these conversations, Dr. Nwozo believed that Wilhite understood the effect of refusing his medical recommendation to consume a soft diet. Nwozo Dep. 24:12-18; 25:19-24; 26:1-13. Nurses' notations, as interpreted by Dr. Nwozo, reveal that from March 23, 2008 to March 29, 2008, Wilhite was alert and oriented at all times, feeding himself, able to take showers and perform self-care, able to go to the bathroom by himself, and able to walk around on his own. Nwozo Dep. 20:14-24; 21:1-21. In progress notes dated March 28, 2008, Dr. Nwozo reported that Wilhite was alert and oriented, in no acute distress, and was able to comprehend what was going on around him. Nwozo Dep. 16:2-21; 29:4-10. At this time, Wilhite was not on numerous pain medications or otherwise highly medicated, and Dr. Nwozo testified that Wilhite's medical conditions were resolved by March 28, 2008. Nwozo Dep. 17:10-14; 28:20-24; 29:1-3.

At the time of Wilhite's discharge, no pain medication was noted on the discharge summary, and Dr. Nwozo could not recall having him on pain medication at the time of discharge. Nwozo Dep. 12:5-21. Dr. Nwozo also testified that the plaintiff's medical records show that blood pressure medication was the only pharmaceutical administered to Wilhite in March 2008. Nwozo Dep. 28:2-13. When Wilhite was sent to the housing unit to await transfer back to the prison, he was alert and oriented and able to understand the medical care that he had received and the discharge instructions. Nwozo Dep. 13:20-24; 14:1-11. Wilhite fails to present evidence suggesting otherwise.

The deposition testimony of Dr. Azimi further supports the conclusion that Wilhite was under no disability in March 2008. During his screening of the plaintiff, Dr. Azimi asked questions regarding Wilhite's background, his time in prison, and his identifying information, to which Wilhite responded accurately. Azimi Dep. 15:7-18, Oct. 30, 2009. The plaintiff exhibited no difficulty with his short-term or long-term memory. Azimi Dep. 16:1-11. After conversing with Wilhite, Dr. Azimi concluded that he was cooperative, aware of the medical care that he was receiving, alert, oriented, and that his mood was stable. Azimi Dep. 19:21-24; 20:1-13. Dr. Azimi explained that had the plaintiff had some difficulties, or had he noticed anything unusual, he would have followed up by talking to the nursing staff or the physicians or by scheduling a psychiatric evaluation. Azimi Dep. 21:13-21. Dr. Azimi did not believe any further referral was necessary. Azimi Dep. 21:22-24; 22:1-6. Wilhite responds to this evidence with nothing but conclusory assertions.

The fact that Dr. Nwozo's notations regarding the timing of his consultation with the plaintiff regarding the dental soft diet differ from the dates in the medical record does not alter our conclusion that Wilhite failed to present evidence that he was incapacitated in March 2008. Similarly, the fact that Dr. Azimi's mental evaluation was brief and not conducted face-to-face does not mean that it cannot be relied upon by this Court. Dr. Azimi's screening of the plaintiff was not a comprehensive mental evaluation, but it was sufficient to convince Dr. Azimi that no further medical treatment was necessary. Beyond his own conclusory statements, the plaintiff can point to nothing in the record from which we could conclude that he was unable to manage his day-to-day affairs or understand his legal rights and responsibilities. *See Sherrill*, 325 S.W.3d at 601. The medical evidence contradicts the plaintiff's unsubstantiated assertion that he was either unconscious or highly medicated from the date of his injury through April 2008. Rather, the deposition testimony of Dr. Nwozo and Dr. Azimi paints a very different picture of Wilhite at that time–someone who was able to care for himself, make choices regarding treatment options, carry on a conversation, and appear alert and attentive. Thus, the plaintiff has failed to carry his burden of establishing that the statute of limitations should be tolled.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

No. 11-6259
*Wilhite v. Corrections Corporation of America, et al.*

**JANE B. STRANCH, dissenting**. Respectfully, I cannot join the majority opinion. I have no quarrel with the majority's statement of the legal principles applicable to our analysis, but if the entirety of the evidence is viewed in the light most favorable to Calvin Wilhite, as case law requires, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), then genuine disputes of material fact exist for trial on whether the statute of limitations bars his claims. Because summary judgment for the defendants is inappropriate on this record, I would reverse and remand.

The majority relies heavily on certain excerpts from the deposition testimony of Dr. Nwozo and Dr. Azimi to support the defendants' position that Wilhite was mentally competent to manage his own affairs by March 31, 2008, as the district court found. The testimony of these physicians simply does not so clearly favor the defendants. Disputes of material fact remain.

On page 7 of the opinion, the majority points to Dr. Nwozo's testimony that Wilhite twice refused a dental soft diet on February 25 and March 2, 2008, and on both occasions Dr. Nwozo counseled Wilhite about the legal aspects of his decision and required him to sign Refusal of Medical Services forms. This evidence is presented as proof that Wilhite was sufficiently mentally competent to understand his legal rights when he signed the forms.

Dr. Nwozo's testimony is so internally contradictory that a jury could seriously question whether to believe any of it. Dr. Nwozo first testified that it was his responsibility to advise Wilhite about the ramifications of rejecting a dental soft diet and that he personally counseled Wilhite on February 25 and March 2 before Wilhite signed the refusal forms on those dates. Dr. Nwozo further

11

insisted that he "wouldn't have allowed [Wilhite] to sign" the forms if he thought Wilhite was mentally incompetent.

Dr. Nwozo later admitted, however, that he did not personally provide counseling before Wilhite signed the forms. A nurse on the floor conducted the counseling and Dr. Nwozo was not even present to hear what the nurse or Wilhite said. He also admitted that he simply initialed the refusal forms *the day after* Wilhite signed them. Therefore, Dr. Nwozo's testimony does not support the defendants' position that Dr. Nwozo personally counseled Wilhite and found him to be mentally competent to sign the forms.

At page 7 of the opinion, the majority faults Wilhite for his failure to "explain how Dr. Nwozo allegedly acquired [the] personal knowledge" that Wilhite was taking "required pain medication" in late March and early April 2008, yet the medical record did not include any documentation of a pain medication order. Wilhite *did* explain. He pointed to portions of Dr. Nwozo's deposition testimony that the defendants themselves produced.

Dr. Nwozo testified that Wilhite was prescribed a dental soft diet because his fractured jaw was wired shut and "because they (sic) can't chew . . . we put them (sic) on pain medication for the pain." When asked by defense counsel if he ordered pain medication for Wilhite, Dr. Nwozo answered, "I can't remember." When defense counsel asked if any pain medication that was ordered would be reflected in the discharge summary, Dr. Nwozo responded: "Sometimes we do; sometimes, you know, we don't – sometimes we don't specify all the medication in the discharge summary." This testimony fails to support the defense position that Wilhite was *not* on pain

12

medication and was mentally competent when he was discharged from the Deberry hospital facility and placed in a regular room to await transfer back to HCCF. Rather, the testimony raises another genuine dispute of material fact that is appropriate for jury resolution, not summary judgment.

Dr. Azimi's testimony is also not conclusive as to whether Wilhite was mentally competent to manage his affairs by March 31, 2008. Dr. Azimi conducted one brief, routine mental-status screening of Wilhite, probably in early February 2008.[1] The screening lasted for "very brief moments," was conducted through the screen door to Wilhite's room while he was in bed, and involved no psychological testing. Although Dr. Azimi testified that Wilhite was "very cooperative," he also stated that Wilhite offered brief answers to questions indicating that "he did not want to continue with me." By Dr. Azimi's own admission, it was "not a very comprehensive screening," and when asked if he drew any conclusions about whether Wilhite was mentally incompetent, Dr. Azimi answered: "[I]ncompetent, I mean, I don't know . . . I think he was competent to discuss things with me and . . . carry on a conversation, so that was not really unusual." Yet, Dr. Azimi admitted that he could not and did not verify whether any information Wilhite gave in answer to his questions was true, except perhaps Wilhite's birth date, which could be confirmed by looking in the medical record.

This testimony does not compel a conclusion as a matter of law that Wilhite was mentally competent, either at the time of the screening or, more importantly, on March 31, when the district

---

[1]The date on Dr. Azimi's written report of the screening was earlier than the date Wilhite was admitted to Deberry. He explained that the screening would have occurred approximately thirty days after Wilhite was admitted in early January 2008.

court found Wilhite to be competent. Even Dr. Nwozo did not want to guess whether Wilhite suffered from a mental disability at the time of discharge from the Deberry hospital facility on April 2 because a "psychiatrist will better make that kind of judgment."

Defendants, as the moving parties on a motion for summary judgment, carry the burden to demonstrate the absence of any genuine issues of material fact. *See* Fed. R. Civ. P. 56(a); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 646 (6th Cir. 2012). Their evidence falls far short of this standard. Moreover, based on his affidavits and briefing, Wilhite presumably would testify that he does not remember the details of the assault and that he was not mentally competent between March and June 2008 to "understand his . . . legal rights and responsibilities, including the cause of action that [had] accrued." *Sherrill v. Souder*, 325 S.W.3d 584, 601 (Tenn. 2010). Wilhite avers that he did not learn the facts about his injury until he returned to HCCF in June 2008 and other prisoners told him what happened. This is fully consistent with the admitted nature of the injuries he suffered in the attack by his cellmate. Moreover, Dr. Nwozo and Dr. Azimi confirmed that they did not discuss with Wilhite *any* facts relating to the origin of his physical injuries.

Because a jury must hear the evidence on mental competence and claim accrual to decide whether Wilhite missed the statute of limitations by one day, *see id.* at 599–600, I would reverse the grant of summary judgment in favor of the defendants and remand for trial. Accordingly, I dissent.