*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0431P (6th Cir.)
File Name: 01a0431p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

WONDERLAND SHOPPING
CENTER VENTURE LIMITED
PARTNERSHIP,
      *Plaintiff-Appellant,*

MACOMB MALL ASSOCIATES
LIMITED PARTNERSHIP, et al.,
      *Plaintiffs,*

*v.*

CDC MORTGAGE CAPITAL,
INC., et al.,
      *Defendants-Appellees.*

No. 01-1668

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-70056—Denise Page Hood, District Judge.

Argued: October 26, 2001

Decided and Filed: December 20, 2001

Before:  JONES and CLAY, Circuit Judges; DOWD,
District Judge.[*]

---

**COUNSEL**

**ARGUED:**    I. W. Winsten, HONIGMAN, MILLER,
SCHWARTZ & COHN, Detroit, Michigan, for Appellant.
Kathleen A. Lang, DICKINSON, WRIGHT, PLLC, Detroit,
Michigan, Eric S. Rosenthal, BARRIS, SOTT, DENN &
DRIKER, Detroit, Michigan, for Appellees. **ON BRIEF:** I.
W. Winsten, HONIGMAN, MILLER, SCHWARTZ &
COHN, Detroit, Michigan, for Appellant. Robert P. Hurlbert,
DICKINSON, WRIGHT, PLLC, Detroit, Michigan, for
Appellees.

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiff, Wonderland Shopping
Center Venture Limited Partnership ("Wonderland"), appeals
from the district court's order denying Plaintiff's motions for
preliminary injunction and summary judgment, and granting
summary judgment in favor of Defendants, CDC Mortgage
Capital, Inc., CDC Depositor Trust ST I, LaSalle National
Bank, and CDC Depositor Trust ST I Commercial Mortgage
Pass-Through Certificates Series 1998-ST-I, on Plaintiff's
claim for breach of contract under Michigan law and
Defendants' counterclaim requesting declaratory judgment of
the parties' rights and liabilities under a contract.  For the
reasons set forth below, we **AFFIRM** the order of the district
court.

---

[*] The Honorable David D. Dowd, Jr., United States District Judge for
the Northern District of Ohio, sitting by designation.

**CONCLUSION**

For the above reasons, we **AFFIRM** the district court's order granting summary judgment for Defendants on Plaintiff's breach of contract claim, denying summary judgment for Plaintiff, and denying Plaintiff's motion for preliminary injunction of a mortgage foreclosure.

**BACKGROUND**

On January 4, 2001, Plaintiff and non-appealing co-plaintiffs, Macomb Mall Associates L.P. ("Macomb Mall"), and Columbus Mall Associates L.P. ("Columbus Mall"), filed suit against Defendants, CDC Mortgage Capital, Inc., CDC Depositor Trust ST I, and CDC Depositor Trust ST I Commercial Mortgage Pass-Through Certificates 1998-ST-I, for breach of three loan agreements pursuant to Michigan law. In their answer filed on February 27, 2001, Defendants asserted counterclaims requesting a declaration of the rights and obligations of the parties under a contractual provision common to all three loan agreements. On March 21, 2001, Plaintiff and the non-appealing co-plaintiffs filed an amended complaint, joining Defendant LaSalle National Bank ("LaSalle"), and adding a request for an injunction of a mortgage foreclosure announced by Defendants.

Pursuant to the district court's expedited scheduling order, on April 3, 2001, Defendants filed a motion for summary judgment with regard to the breach of contract claims. Plaintiff opposed Defendants' motion, filing a cross-motion for summary judgment and a motion for a preliminary injunction against a foreclosure sale on April 10, 2001. Co-plaintiffs Macomb Mall and Columbus Mall subsequently settled their claims against Defendants and, on April 27, 2001, the district court dismissed their claims.

The district court held a hearing on the summary judgment motions and Plaintiff's motion for preliminary injunction on May 2, 2001. Two days later, on May 4, the district court granted Defendants' motion for summary judgment and denied Plaintiff's motion for summary judgment and preliminary injunction. The district court accepted Defendants' construction of a key, disputed contract provision, and thus concluded a preliminary injunction was unnecessary because Plaintiff could not show likelihood of success on the merits. Even though the district court rejected Plaintiff's request for a preliminary injunction, the district

court concluded that a security bond of $1.2 million would have been appropriate pursuant to Fed. R. Civ. P. 65(c) if a preliminary injunction had issued.

On May 18, 2001, the Sheriff of Wayne County, Michigan conducted a mortgage foreclosure sale on the property subject to the loan agreement. Defendant LaSalle purchased the property.

**Facts**

Plaintiff Wonderland is a Michigan limited partnership with its principal place of business in Southfield, Michigan. Plaintiff owns and operates a shopping mall in Livonia, Michigan. On December 11, 1997, Nomura Asset Capital Corporation ("NACC") loaned Plaintiff $41,650,000.00 pursuant to a loan agreement ("the agreement" or "the contract") and promissory note ("the note"). In early 1998, NACC transferred the loan to its affiliate Nomura Depositor Trust ST I ("Nomura Depositor"), which subsequently assigned this and other loans to a trust, Nomura Depositor Trust ST I Commercial Pass-Through Certificates Series 1998-ST-I ("the Trust"). Defendant LaSalle, a nationally chartered bank with its principal place of business in Chicago, Illinois, was the trustee for the Trust.

On August 2, 1999, Defendant CDC Mortgage Capital, Inc. ("CMCI"), a New York corporation with its principal place of business in New York City, acquired the loans from NACC, including all of NACC's rights, obligations, and liabilities under the loan agreement between NACC and Plaintiff. With this acquisition, the Trust became known as CDC Depositor Trust ST I Commercial Mortgage Pass-Through Certificates Series 1998-ST-I. The Trust is the holder of the loans, and CMCI's affiliate, Defendant CDC Depositor ST I, is the directing holder of the Trust with the right to take certain actions with regard to the loans in the Trust. LaSalle remained trustee for the Trust.

**B.  Rule 65(c) Bond**

Federal Rule of Civil Procedure 65(c) provides: "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the district court deems proper." Even though the district court denied the preliminary injunction and determined the issue of a bond was moot, the district court analyzed the issue and concluded a $1.2 million bond would be appropriate, had the injunction issued.

Plaintiff challenges the district court's calculation of a security bond. We refrain from ruling on this challenge. Rule 65(c) does not mandate setting of security absent issuance of a restraining order or preliminary injunction. The district court's refusal to enjoin the foreclosure rendered moot the propriety and amount of security under Rule 65(c). Moreover, the district court did not actually impose or require Plaintiff to post security. Because we have concluded that the district court properly refused to enjoin the foreclosure, our expressing an opinion on the propriety of the district court's forecast of what it *would* have done had an injunction issued will not affect the rights or interests of either party. *Cf. Johnson v. Turner*, 125 F.3d 324, 336-37 (6th Cir. 1997) ("a federal court has no jurisdiction to hear a case that cannot affect the litigants' rights" (citation omitted)); *George Fisher Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH*, 55 F.3d 1206, 1210 (6th Cir. 1995) (applying the principle that federal courts lack the power to render advisory opinions and to resolve issues that have no effect on the rights of litigants). Plaintiff's challenge to the district court's calculation of security is therefore tantamount to requesting a disfavored advisory opinion from this Court. *See Int'l Union, United Auto, Aerospace, Agric. & Implement Workers of Am. v. Dana Corp.*, 697 F.2d 718, 720-21 (6th Cir. 1983) (en banc).

An examination of the other preliminary injunction factors confirms this conclusion. Although Plaintiff would sustain irreparable injury through a foreclosure in terms of losing unique real property, enjoining the foreclosure would also have a deleterious effect on Defendants, who would have to delay any sale of the property in an uncertain economy and continue to rely on the funds in the Cash Trap for the mall's operating expenses. Plaintiff also predicts dramatic harm to mall tenants in the event of a mortgage foreclosure. Plaintiff's concern for an abrupt mass eviction of mall tenants is, however, somewhat belied by Defendants' concern for the financial ramifications of delaying the foreclosure and three tenants' vacation of the property. Finally, Plaintiff and Defendants offer sound policy reasons in support of and in opposition to enjoining the foreclosure. Plaintiff suggests that public policy seeks to protect consumers from wrongful foreclosures on property, and that the public interest favors the integrity of securities markets. Allowing Defendants to take a position contrary to the representations of the offering circular could, Plaintiff argues, contravene the public interest in the securities markets. Defendants contend that public policy favors the enforcement of contracts according to their terms. Defendants further contend that enjoining foreclosure would destabilize faith in mortgage notes creating security interests in real estate financing. We agree with the district court that all of these policy arguments are valid and strong, and that, overall, the arguments favor neither Plaintiff nor Defendants.

We therefore find no abuse of discretion by the district court in denying Plaintiff's motion for a preliminary injunction.

The loan extended to Plaintiff is called a "Reverse Earn-Out Loan," a type of loan secured on properties with currently unstable cash flows, expected to experience improvement in the future. In recognition of this expected improvement, the original loan amount was based on Plaintiff's anticipated net operating income ("NOI"). During the first three years of the loan, the loan agreement obligated Plaintiff to make interest payments only but set performance goals for Plaintiff. Plaintiff's stated three-year goal, in the language of the loan agreement, was a "Stabilization NOI [that] produces a Debt Service Coverage Ratio of [greater than] 1.20 to 1." (J.A. at 476). In other words, the loan agreement gave Plaintiff three years to attain net operating income sufficient to cover 120% of its debt.

If, after three years, Plaintiff had not attained this goal, then the loan agreement provides a mechanism for "resizing," or reducing, the loan amount to a level sufficient to allow Plaintiff to cover 120% of its debt. Section 7(b) of the note and section 2.9 of the agreement address matters pertaining to this resizing mechanism. Section 7(b) of the note provides:

> If the Stabilization NOI produces a Debt Service Coverage Ratio (based upon the Original Principal Amount and the Debt Service Constant) of less than 1.20 to 1, Payee[1] shall have the option, in its sole and absolute discretion, to decrease the principal amount of the Loan (the "Resizing") in order to achieve a minimum Debt Service Coverage Ratio of 1.20 to 1, based upon such reduced principal balance (the "Resized Principal Balance") and the Debt Service Constant, by requiring [Plaintiff] to repay a portion of the Loan without premium or penalty equal to the difference ("Difference") between (i) the Original Principal Amount and (ii) the Resized Principal Balance. The Resized

---

[1] The note identifies NACC as "Payee." As NACC's successors in interest, Defendants are considered "Payee."

Principal Balance shall be subject to adjustment in accordance with Section 7(d) below.[2]  [Plaintiff] shall repay the Difference, together with all accrued and unpaid interest through the end of the interest calculation period in which the repayment is made, on the date (the "Conversion Date") which is the eleventh (11th) day of the first calendar month following the calendar month in which Payee notifies [Plaintiff] of Payee's determination of the Difference.  [Plaintiff] may only repay the Difference from (a) the Buy-up Fee payable to [Plaintiff] under Section 7(d), (b) cash from [Plaintiff] which does not result in a lien on the Loan proceeds or the Mortgaged Property, or (c) the proceeds of the Mezzanine Financing described in the Loan Agreement.

(J.A. at 545 (footnote 2 added).)   Section 2.9 of the agreement, headed "Mezzanine Financing," provides:

If the Stabilization NOI produces a Debt Service Coverage Ratio of less than 1.20 and 1 and [Plaintiff] does not (i) elect to repay the Difference in cash pursuant to its rights under the Note or (ii) prepay the Loan in accordance with the provisions of Section 2.8[3], Borrower shall repay the Senior Mezzanine Loan Amount with the proceeds of senior mezzanine financing which shall be provided by Lender on the following terms and conditions:  . . . .

(J.A. at 476 (footnote 3 added).)  Sections 2.9.1 and 2.9.2 proceed to describe "mezzanine financing," a series of unsecured loans for the excess, unresized loan principal repayable only from available cash but convertible by Defendants or a successor into equity interests in Plaintiff.

---

[2] The content of § 7(d) is not germane to this appeal.

[3] The content of § 2.8 is not germane to this appeal.

the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).  "A legal or factual error may be sufficient to determine that the district court abused its discretion.  However, absent such an error, the district court's weighing and balancing of the equities is overruled 'only in the rarest of cases.' "  *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992) (quoting *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989)).

The district court must consider and balance four factors in deciding whether to issue a preliminary injunction: (1) the moving party's likelihood of success on the merits; (2) the moving party's likelihood of suffering irreparable injury absent the injunction; (3) the requested injunction's potential for causing substantial harm to others; and (4) the degree to which the injunction would serve the public interest.  *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998).

The district court viewed Plaintiff's likelihood of success on the merits as the key factor for determining the appropriateness of a preliminary injunction.  The district court concluded Plaintiff had failed to meet its burden of proof with regard to this issue, finding the loan agreement and note confirmed Defendants' discretion to resize the loan.  Our interpretation of the contract leads to the same conclusion stated by the district court:  the contract grants Defendants the discretionary authority to reduce the principal amount of the loan.  Because we have concluded that summary judgment on Plaintiff's breach of contract claim was warranted, and because "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000), we conclude Plaintiff has failed to show any likelihood of success on the merits and an injunction of the foreclosure was not necessary.

2001 on which date the Wonderland Mall Loan will be resized . . . ." (J.A. at 263.) Plaintiff ascribes particular meaning to the presence of this intention in the offering circular, given the existence of criminal and civil penalties for misstatements under the securities laws. Much of the language in the offering circular, however, is highly tentative. For instance, the first page of the circular states the Trust "*will consist primarily* of a revolving pool of commercial and multifamily mortgage loans that *may from time to time* be comprised of [various mortgages] . . . and *may also consist of* [various securities] . . . that will be transferred to the Trust Fund . . . ." (J.A. at 144 (emphasis added).) Concerning the mortgages contained in the Trust, the circular states, "It is expected that a significant portion of the Current Mortgage Assets will not remain in the Trust Fund for the life of the Certificates." (J.A. at 194.) Bearing these provisional statements in mind, we must reject Plaintiff's assertion that the offering circular amounts to some sort of "smoking gun."

We therefore conclude that the district court properly construed the loan agreement. The provision of the note granting Defendants discretion to resize is incorporated into the loan and does not conflict with other terms of the agreement. The contract and its terms are unambiguous and thus the district court properly refused to consider Plaintiff's extrinsic evidence. The district court properly granted summary judgment in Defendants' favor on Plaintiff's breach of contract claim.

## II.   MOTION FOR PRELIMINARY INJUNCTION AND CALCULATION OF BOND

### A.   Motion for Preliminary Injunction

This Court reviews the district court's denial of a motion for a preliminary injunction for abuse of discretion. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Under this standard, the Court will overturn a district court's determination regarding a preliminary injunction "if

In an affidavit submitted in opposition to Defendants' motion for summary judgment, David W. Schostak ("Schostak"), president of Plaintiff's general partner, discussed the negotiations leading to the loan agreement. Shostak stated that NACC officials:

> all told me that the Loans would be pooled with other loans so that the rights to the principal and interest from all of these pooled loans could be sold to investors in a securities offering; the Loan's resizing feature functioned as a 'pre-packaged workout provision,' thus preventing a default or foreclosure of the Loans and thereby facilitating the securities offering; the lender was required to resize each Loan if a Borrower did not achieve the required NOI so as to avoid a default that would impair the securities offering; and the securities offering was enhanced by the resizing feature that reduced the amount of the secured Loan to a level where the Borrower would not be in default.

(J.A. at 442.)

On September 23, 1998, Nomura Depositor released an "offering circular" as part of an effort to issue over $1.3 billion in securities ("the offering circular"). The offering circular identified and described the Trust's mortgage assets, including "Reverse Earn-Out Loans," and specifically discussed the loan to Plaintiff. Concerning this loan, the circular explained, "The Wonderland Mall Loan is a Reverse Earn-Out Loan which will be resized to a [Debt Service Coverage Ratio] of 1.20 based on a 9.23 % debt service constant." (J.A. at 263.)

On November 13, 2000, NACC's successor, Defendant CMCI, wrote to Schostak. The letter stated, "Based on our review of the most recent financial reports for each of the properties securing the Loans, CDC anticipates that each Borrower will be required to pay down a significant portion of its Loan on the Conversion Date (January 11, 2001)." (J.A.

at 651.)  The letter then requested, "[i]n connection with our determination of the re-sized Loan amounts," certain information regarding the property subject to the loan agreement.  (J.A. at 651.)  The letter also provided a name and phone number for "questions regarding the pending loan re-sizing process."  (J.A. at 652.)

Plaintiff received a second letter from Defendants on December 8, 2000.  In this letter, Defendants explained they were, pursuant to § 7 of the note, electing not to reduce the loan amount's principal balance.  The letter further explained:

> This election produces a Difference of zero and therefor the borrower will not be obligated to prepay any portion of the loan or to enter into the mezzanine loans contemplated in Section 2.9 of the Loan Agreement.  The loan servicer will be notified of this determination and shall be instructed to begin amortizing the loan on the Conversion Date in accordance with the loan documents.

(J.A. at 653.)  The same day, Defendants notified Macomb Mall and Columbus Mall of their election to resize similar loans extended to Macomb Mall and Columbus Mall.

Plaintiff, believing the loan agreement obligated Defendants to resize, calculated the amount due if the loan agreement required resizing.  Plaintiff then sent payment to Defendants' loan servicer for the amount of principal and interest due for the resized amount as of January 11, 2001.  Defendants responded by notifying Plaintiff it had failed to make full payment, an event it considered an "Event of Default."  Defendants required Plaintiff to cure the monetary default by making a principal and interest payment on the unresized loan by January 29, 2001.  When Plaintiff did not make a curative payment, Defendants, on February 2, 2001,

We are convinced that no ambiguity exists, whether on the face of the contract or in light of Plaintiff's extrinsic evidence. Concerning the contract itself, Plaintiff fails to identify a term or provision of the contract reasonably susceptible to two meanings.  Instead, Plaintiff reiterates its flawed analysis of the operation of the resizing mechanism.  According to Plaintiff, this Court needs to consider extrinsic evidence of the parties' intent to create mandatory resizing in order to avoid the "absurd and illogical result" of interest payments in perpetuity.

Although the loan agreement and the note define the contract's essential provisions in a somewhat complex manner, the definitions are clear and unambiguous. Specifically, Plaintiff's analysis misconstrues and misapplies the key definitions of "the Difference" and "Conversion Date," both of which are accessible through careful reading of the contract.  Properly defining and applying these terms, without going beyond the loan agreement and note, leads to a coherent and unambiguous commercial transaction.  While comprehension of this complex commercial financing arrangement may require some contract interpretation, that fact alone does not render the contract ambiguous.

Moreover, the "sole and absolute discretion" language is unambiguous.  Contrary to Plaintiff's prediction, enforcing the "sole and absolute discretion" language does not lead to an absurd or illogical result.  Even if this provision were somehow ambiguous, Plaintiff's extrinsic evidence does not explain the meaning of a term of the contract.  Plaintiff offers the evidence as a direct contradiction to the "sole and absolute discretion" language in the contract.

Finally, the extrinsic evidence itself does not demonstrate an ambiguity in the parties' agreement.  Plaintiff's offering circular evidence does suggest an understanding, at least at the time the circular was released, that the loan would be resized.  The circular states, "The Wonderland Mall Loan requires fixed payments of interest only until February 11,

oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

(J.A. at 528.) Under Michigan law, this integration language conclusively establishes the finality and completeness of the written agreement. *See Cook*, 210 F.3d at 656.

Schostak's affidavit seeks to show an understanding that the resizing mechanism was mandatory, rather than discretionary. This assertion, describing statements contemporaneous with contract negotiations, contradicts the "sole and absolute discretion" language of § 7(b) of the note. The district court properly refused to consider Schostak's affidavit pursuant to the parol evidence rule.

Plaintiff urges the Court to consider Schostak's affidavit and the offering circular under a different theory. According to Plaintiff, the note's "sole and absolute discretion" language is ambiguous. Because of this ambiguity, Plaintiff contends Schostak's affidavit and the offering circular should be admissible to explain the meaning of the loan agreement and the parties' interpretation of it.

Michigan permits the use of extrinsic evidence to dispose of a potential ambiguity, to prove the existence of a potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists. *Am. Adnodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422 (6th Cir. 1984). Whether an ambiguity exists in a written contract is a question of law for the Court's resolution. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998). A contract or term is ambiguous if it is reasonably susceptible to more than one meaning. *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982). At the same time, a "court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Mich. Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941).

declared a "Cash Trap Event" under the loan agreement,[4] requiring Plaintiff's bank to transfer to LaSalle all rents received by Plaintiff. On March 13, 2001, Defendants' attorney notified Plaintiff that due to the "Event of Default" on January 11, Defendant was accelerating the debt secured by the loan agreement and would foreclose on the mortgage. LaSalle purchased the Wonderland Mall property at a May 18, 2001 mortgage foreclosure sale conducted by the Sheriff of Wayne County.

## DISCUSSION

## I. BREACH OF CONTRACT CLAIM

### A.  The Loan Agreement

The key area of dispute between the parties is whether the loan agreement imposed a mandatory or discretionary obligation on Defendants to resize the loan amount. Plaintiff argues the "Mezzanine Financing" provision of § 2.9 of the loan agreement controlled over other provisions of the contract and required Defendants to resize. Defendants disagree with Plaintiff's interpretation of the contract, arguing that the contract incorporated § 7(b) of the note, and that § 7(b) explicitly made resizing a matter for Defendants' discretion. The district court construed the contract as endowing Defendants with the discretionary authority to resize the loan, and granted summary judgment in Defendants' favor on the breach of contract claim. This Court reviews the district court's order granting summary judgment *de novo*. *White Consol. Indus., Inc. v Westinghouse Elec. Corp.*, 179 F.3d 403, 407 (6th Cir. 1999).

---

[4] Section 2.6(a) of the loan agreement requires Plaintiff to keep all rents in a particular bank account, and, in the event of a "Cash Trap Event," requires Plaintiff's bank to transfer to Defendants' bank the deposits contained in this account. Section 2.6(a) lists an "Event of Default" as one of several "Cash Trap Events."

Because this is a diversity action in a matter filed in a Michigan district court, the substantive law of Michigan applies. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941); *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). This Court must follow and apply Michigan law in accordance with the controlling decisions of the Supreme Court of Michigan. *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239 (6th Cir. 1994).

A court's primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties. *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994); *Sobczak v. Kotwicki*, 79 N.W.2d 471, 475 (Mich. 1956). The court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their "ordinary and natural meaning." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (citing *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993)). *See also Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997) (explaining that Michigan contracts are construed as a whole, and that courts should not eliminate any part or word "unless absolutely necessary"). When the written agreement refers to a separate document for additional contract terms, the court must read the writings together. *Forge v. Smith*, 580 N.W.2d 876, 881 (Mich. 1998). Moreover, whether the parties included the terms in a separate incorporated document or within the agreement itself, the court must strive to harmonize apparently conflicting terms or clauses. *Fresard v. Mich. Millers Mut. Ins. Co.*, 327 N.W.2d 286, 289 (Mich. 1982).[5] If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing. *Birchcrest Bldg. Co. v. Plaskove*, 120 N.W.2d 819, 823 (Mich. 1963).

---

[5] The general rules of contract construction apply equally to an insurance contract, the subject of *Fresard*, and any other contract. *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999).

agreement. This absence of conflict requires, under Michigan law and the contract itself, the enforcement of § 7(b) on equal footing with other provisions of the contract. Defendants properly carried out their obligations under the contract by electing against resizing.

## B.  Plaintiff's Extrinsic Evidence

The extrinsic evidence Plaintiff offers in support of its competing interpretation of the nature of the resizing mechanism does not affect our analysis of the contract or resolution of this appeal. Plaintiff's extrinsic evidence consists of: (1) Schostak's affidavit describing representations made by NACC officials during loan negotiations in 1997; and (2) Nomura Depositor's 1998 offering circular. Michigan law permits consideration of neither of these items of extrinsic evidence.

Michigan's parol evidence rule bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement. *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 656 (6th Cir. 2000). Even though extrinsic evidence of contemporaneous or prior negotiations is admissible to show the parties did not intend the written agreement to be final and complete, an integration clause in a written contract conclusively establishes that the parties intended the written contract to be the complete expression of their agreement. *Id.* (citing *NAG Enters., Inc. v. All State Indus., Inc.*, 285 N.W.2d 770, 771 (Mich. 1979); *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 502 (Mich. Ct. App. 1998)).

Section 10.23 of the loan agreement, entitled "Prior Agreements," declares:

> This Agreement and the other Loan Documents contain the entire agreement of the parties hereto in respect to the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether

Although until the Conversion Date, Plaintiff had only interest payment obligations, after the Conversion Date the note alters Plaintiff's obligations. After the Conversion Date, the note requires a constant payment based on: (1) the applicable interest rate; (2) a specified amortization schedule; and (3) "the original principal amount . . . *or, if a Resizing (as such term is hereafter defined in Section 7(b)) is effected* pursuant to Section 7(b), the Resized Principal Amount." (J.A. at 656 (emphasis added)).

Although Plaintiff contends that the Difference cannot equal zero and that declaring a Difference of zero would be inconsistent with the resizing mechanism, we envision nothing inconsistent with requiring Defendants to declare a Difference before Plaintiff becomes obligated to make principal and interest payments on the loan. Before Defendants can receive principal payments, Defendants must consider the advisability of lowering the principal amount of the loan in exchange for equity interests of Plaintiff. Defendants could determine, as they did with the Macomb Mall and Columbus Mall loans, resizing was appropriate, determine an amount by which to reduce the loan (determining the Difference), and proceed with the terms of § 7(b) of the note and § 2.9.1 of the loan agreement. On the other hand, Defendants could examine the circumstances surrounding Plaintiff's loan and determine that lowering the principal amount was not in the interests of the loan transaction. The note's payment formula favors this construction by basing Plaintiff's post-Conversion Date payments on, in addition to an amortization term and interest, either the original principal amount or the resized principal amount, if Defendants decide to undertake resizing. Instead of producing the "absurd or illogical" result Plaintiff portends, Defendant's election against resizing (and declaring a Difference of zero) leads to principal payment obligations according to the arrangement provided in the note.

Granting Defendants the "sole and absolute discretion" to resize does not conflict with other terms of the loan

In addition to these general rules of Michigan contract construction, the loan agreement prescribes some construction rules of its own. Pertinent to this appeal are the prescriptions contained in § 10.14, entitled "Exhibits Incorporated," and § 10.20, entitled "Conflict; Construction of Documents." Section 10.14 incorporates attached exhibits into the agreement, "with the same effect as if set forth in the body hereof." (J.A. at 527.) Several exhibits are attached to the loan agreement, including Exhibit B, a sample mortgage promissory note documenting a loan of $41,650,000 to Plaintiff. Exhibit B and the note executed by Plaintiff on December 11, 1997, are identical. Section 10.20 describes the treatment of a conflict between the agreement and a separate document executed in connection with the loan. This section provides:

> In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by counsel in connection with the negotiation and drafting of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

(J.A. at 527-28.) The note, mortgage, and agreement are among various materials identified as "Loan Documents."

Defendants argue that as an incorporated part of the agreement, the provisions of the note have the same effect as matters contained in the agreement. Because § 7(b) of the note gives Defendants "the option, in [their] sole and absolute discretion," to resize the loan, then the agreement permitted, but did not require, Defendants to reduce the principal through resizing. Defendants argue they elected not to resize and thus complied with their contractual obligations. Plaintiff argues that as a provision of the loan agreement rather than a separate "Loan Document," § 2.9.1 of the loan agreement is superior to any provision of the note and thus should govern

in the case of a conflict. Section 2.9.1 does not frame "Mezzanine Financing," one of the mechanisms for repaying the excess principal after resizing, in discretionary terms. Instead, § 2.9.1 states if Plaintiff has failed to reach its operating income and debt coverage goals, and Plaintiff does not prepay the loan amount or "repay the Difference in cash," Plaintiff "shall repay" according to mezzanine financing. For this reason, Plaintiff argues § 7(b) of the note, containing discretionary language, and § 2.9.1 of the agreement, containing no discretionary language, are in conflict. Plaintiff contends that § 2.9.1 is a part of the loan agreement, and is thus superior to a conflicting part of any loan document, such as the note.

Given its incorporation into the agreement via § 10.14, the note is a part of the agreement and the Court must attempt to harmonize its terms with others contained the contract. *Fresard*, 327 N.W.2d at 289. *See also Union Inv. Co. v. Fid. & Deposit Co. of Md.*, 549 F.2d 1107, 1110 (6th Cir. 1977) ("A contract will not be construed so as to reject any words as surplusage if they reasonably can be given meaning." (citing *Vary v. Shea*, 36 Mich. 388, 398 (1877)). Plaintiff argues harmonizing the discretionary language of the note with § 2.9.1 of the agreement is not reasonably possible. According to Plaintiff, if the contract made resizing a matter for Defendants' discretion, the provisions of the note would lead to the "absurd and illogical result" of obligating Plaintiff to make monthly interest payments, but never to make payments of principal. The "absurd result" Plaintiff predicts arises out of Plaintiff's interpretation of a key term in the note.

The note obligates Plaintiff to make interest-only payments until the "Conversion Date," and principal payments thereafter. Plaintiff understands the note to define the "Conversion Date" as either the eleventh day of the month after Defendants resize, or the eleventh day of the month after Plaintiff achieves the target debt service coverage ratio. If, according to Plaintiff, Defendants are not obligated to resize

and if Plaintiff cannot reach the target net operating income, then a Conversion Date would never occur and Plaintiff would never owe principal payments to Defendants.

Plaintiff's definition of the Conversion Date is at odds with the definition in the note. The note defines the Conversion Date as "the eleventh (11th) day of the first calendar month following the calendar month in which Payee notifies Maker of Payee's determination of the Difference." (J.A. at 545.) Although § 7(b) of the note and § 2.9.1 of the loan agreement both address "the Difference," and Plaintiff's method of repaying it, only § 7(b) defines "the Difference." Pursuant to § 7(b) of the note, "the Difference" equals the difference between the original principal amount of the loan and the resized principal balance. In other words, the Difference amounts to the reduction in the original principal due to resizing. Repayment of the Difference becomes due on the Conversion Date: the date Defendants notify Plaintiff of their determination of how much they will reduce the loan principal.

Contrary to Plaintiff's definition, the note does not explicitly mandate resizing to trigger the Conversion Date. Instead, the note requires Defendants to make a determination of the Difference, the amount of reduction in the principal, and notify Plaintiff of that determination. The Conversion Date occurs on the eleventh day of the next month.

Defendants notified Plaintiff of their determination of the Difference in a letter dated December 8, 2000. On that date, Defendants informed Plaintiff of their decision against resizing the loan. Because Defendants chose not to resize, they did not reduce the original principal at all, producing a Difference (reduction in original principal through resizing) of zero. Defendants specifically notified Plaintiff of this Difference determination in the December 8 letter. Pursuant to the terms of the note, then, January 11, 2001, the eleventh day of the month following Defendants providing notice of the Difference determination, was the Conversion Date.