NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0822n.06
Filed: October 6, 2005

No. 04-2262

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **DETROIT INTERNATIONAL BRIDGE CO.** | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **CANADIAN PACIFIC RAILWAY LTD, ET AL.** | ) | **O P I N I O N** |
| | ) | |
| *Defendants-Appellees*. | | |

BEFORE: COLE and ROGERS, Circuit Judges; BECKWITH, District Judge.[*]

**R. GUY COLE, JR., Circuit Judge.** Plaintiff-Appellant Detroit International Bridge Company ("DIBC") sued Defendants-Appellees Expressway Terminal Operations LLC ("Expressway") and various affiliates for breach of an option to purchase land near the Windsor-Detroit border. The district court granted summary judgment to Expressway. DIBC moved for reconsideration and the district court denied the motion. DIBC now appeals. Because DIBC's option had terminated before the alleged breach, we **AFFIRM** the denial of reconsideration.

**I.**

DIBC owned property on Rose Street near the Michigan Central Depot in Detroit, Michigan. Canadian Pacific, Expressway's parent company, approached DIBC in 1999 for the lease of the Rose

---

[*]The Honorable Sandra S. Beckwith, Chief Judge of the United States District Judge for the Southern District of Ohio, sitting by designation.

Street property. The leasehold interest would be owned and operated by Expressway. DIBC executed the lease through its own subsidiary, Crown Enterprises, Inc. ("Crown").

As part of the consideration for the lease of the Rose Street property, DIBC sought an option to purchase land immediately adjacent to the Rose Street property, which was owned by Amtrak. During negotiations, DIBC specifically sought assurances from Canadian Pacific that it would receive an option to purchase the Amtrak property. However, Canadian Pacific indicated that it could not acquire an option to purchase the Amtrak property on behalf of Crown or DIBC. Therefore, the parties negotiated a lease term whereby DIBC would have the right to purchase the Amtrak property from Expressway under certain conditions. Specifically, Canadian Pacific promised to give DIBC an option to purchase the land in the event that Expressway itself acquired and exercised an option to purchase the Amtrak property for any "non-railroad use."[1]

Crown and Expressway entered into the lease on May 8, 2000. The lease provided that if one of the parties did not wish to renew, they need only give 180 days' notice. DIBC declined to

---

[1]The relevant provision reads as follows:

19.     Option to Purchase Amtrak Property

(a)     Tenant [Expressway] is currently seeking to obtain from the National Railway Passenger Corporation ("Amtrak") an option (the "Tenant's Option") to purchase all or part of Assessor's Parcels . . . in the City of Detroit (the "Amtrak Property") that are owned by Amtrak in connection with its lease with Tenant for some of the Amtrak Property (the "Amtrak Lease"). Under the terms of the Tenant's Option, during the term of the Amtrak Lease, Amtrak will notify Tenant of its desire to dispose of some or all of the Amtrak Property. In the event that Tenant exercises the Tenant's Option, and closes on the purchase of some or all of the Amtrak Property, Landlord [Crown] shall have the option (the "Landlord's Option") to purchase any position of the Amtrak Property for a non-railroad use purchased by Tenant pursuant to the Tenant's Option that is not required for railroad purposes, as determined by Tenant in its sole discretion (the "Available Amtrak Property").

renew the lease on December 13, 2002, resulting in a termination of the lease on June 30, 2003.

Meanwhile, during the term of the Crown-Expressway lease, Expressway entered into discussions

with Amtrak to lease the Amtrak property that DIBC wanted to purchase. The Amtrak-Expressway

lease, executed on September 18, 2001, granted to Expressway the option to purchase the property.[2]

On March 19, 2003, the Detroit River Tunnel Partnership ("DRTP") entered into

negotiations for the purchase of the same Amtrak property. Like Expressway, DRTP is affiliated

with Canadian Pacific.[3] DRTP owns the railroad tunnel under the Detroit River connecting Windsor

and Detroit. DRTP intends to convert the existing railroad tunnel into a new commercial truck

tunnel that will compete directly with the Ambassador Bridge, and then to build a new railway

tunnel using the Amtrak property. DRTP is thus Appellant DIBC's direct competitor.

DRTP signed a purchase agreement for the Amtrak property on July 23, 2003. Amtrak

signed on September 2, 2003. The effective date of the purchase agreement was September 5, 2003.

The purchase had a condition precedent: that Expressway decline to exercise its option to purchase

---

[2]The relevant provision reads as follows:

Amtrak hereby grants to Lessee [Expressway] an exclusive option (the "Option") to purchase the Leased Premises (or any part thereof) in the event that Amtrak desires to sell or otherwise dispose of the Leased Premises (or any part thereof) by conveying the Leased Premises (or any party thereof) to a third party. Upon Amtrak's determination that it desires to sell, convey or otherwise dispose of all or any part of the Leased Premises, it shall give notice of such desire to Lessee. Upon Lessee's receipt of such notice from Amtrak, Lessee shall have one hundred eighty (180) days to exercise its option to purchase the Leased Premises (or such portion of the Leased Premises that Amtrak desires to sell, hereinafter referred to as the "Option Parcel") from Amtrak by delivering notice to Amtrak of its exercise (the "Exercise Notice").

[3]More specifically, DRTP is a partnership which is 50% owned by Canadian Pacific and 50% owned by Borealis Transportation Infrastructure Trust, an affiliate of the Ontario Municipal Employees Retirement System.

the Amtrak property. Expressway declined to exercise the option on October 15, 2003. That same day, DRTP and Amtrak closed on the Amtrak property at a purchase price of $2 million.

Shortly after the closing, DIBC brought suit against the Defendants-Appellees in district court. DIBC claimed that "Defendants committed fraud and tortiously interfered with the Crown Lease by (1) inducing Crown into a lease agreement with Expressway with representations that Crown would have a meaningful opportunity to purchase the Amtrak Property, and (2) improperly orchestrating the sale of the Amtrak property to DRTP instead of Expressway, thereby nullifying Crown's option to purchase the property." The Defendants-Appellees filed a motion to dismiss and a motion for summary judgment.

The district court granted summary judgment to the Defendants-Appellees on the ground that DIBC admitted in its brief that DRTP purchased the Amtrak property for railway purposes. Thus, the option — conditioned on a purchase of non-railway use — was not triggered. DBIC filed a motion to reconsider, claiming that the district court mischaracterized its brief and that new evidence in the form of a radio interview revealed that DRTP intended a non-railway use for the Amtrak property. The district court denied the motion to reconsider. This timely appeal ensued.

**II.**

We review *de novo* a district court's grant of summary judgment and subsequent denial of a motion to reconsider. *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 903 (6th Cir. 2004). Given the procedural posture of this case, we are required to view the facts, and all reasonable inferences therefrom, in the light most favorable to the adverse party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Because this is a diversity case, we must apply

controlling decisions of the Michigan Supreme Court to state-law issues. *See Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001).

On appeal, the Defendants-Appellees raised an alternate basis for dismissal to which the Plaintiff-Appellant then responded. Namely, Appellees point out that Expressway had terminated the Crown-Expressway lease prior to the purchase of the Amtrak property. Therefore, the option was no longer in effect at the time of the DRTP purchase. We agree and affirm the district court on this ground. *See Airline Prof'l Ass'n of the Int'l Bhd. of Teamsters v. Airborne, Inc.*, 332 F.3d 983, 986 n.3 (6th Cir. 2003) ("An appellate court can find an alternate basis for concluding that a party is entitled to summary judgment . . . provided it proceeds carefully so the opposing party is not denied an opportunity to respond to the new theory.").

On December 13, 2002, DIBC gave Expressway notification that it would not renew the Crown-Expressway lease. Under its terms, the Crown-Expressway lease therefore terminated on June 30, 2003. Though DRTP engaged in negotiations with Amtrak for the purchase of the Amtrak property while the Crown-Expressway lease was in force, the agreement to purchase was not effective until September 5, 2003. Closing for the Amtrak property occurred on October 15, 2003. Accordingly, the Crown-Expressway lease was not in force when DRTP purchased the Amtrak property.

Under Michigan law, an option to purchase property contained within a lease agreement generally expires upon termination of the lease. *Glocksine v. Malleck*, 125 N.W.2d 298, 300 (Mich. 1963). In *Glocksine*, the lessee had entered a lease that contained an option to purchase the property.

*Id.* at 299. The lease lapsed, and during a holdover period, the lessee sought to exercise the option.

The Michigan Supreme Court held such option had lapsed with the lease:

> It is true that the lease does not explicitly set forth the month, day, and year upon which the options were to expire. Since, however, the options were included in a lease for a definite term, it is reasonable to infer that it was the intent of the parties that the options had to be exercised during the term of the lease.

*Id.* at 300. The Michigan Supreme Court further commented that the resolution was consistent with general principles of contract law: "Moreover, a finding that the option was established for an indefinite period contradicts inherent probabilities, for an option to purchase is of such a nature that it is nearly always intended to be of limited duration." *Id.* Other Michigan cases are in accord. *See, e.g., Brauer v. Hobbs*, 392 N.W.2d 482, 486 (Mich. Ct. App. 1986) ("In Michigan, however, it appears that first refusal agreements, like option agreements, must be for a definite period of time."); *Cox v. McGregor*, 47 N.W.2d 87, 90-91 (Mich. 1951) (noting option expired when lease expired).

DIBC's option to purchase the Amtrak property contains no specific time period. Nor does the specific language of the option clearly indicate that the option was to extend past the life of the underlying lease. Indeed, other terms in the contract support the view that DIBC's option to purchase extended no further than the life of the lease. As noted by Defendants-Appellees, the Crown-Expressway lease contained two provisions that explicitly extended beyond the termination of the lease: the indemnification provision and the environmental hazards provision. Accordingly, if DIBC — Canadian Pacific's equal in sophistication and leverage — wanted its option to extend past the life of the lease, it should have included language in the option term specifically providing for the survival of the option past the life of the lease.

DIBC notes in response that the second sentence of paragraph 19(a) of the Crown-Expressway lease states: "Under the terms of the Tenant's Option, during the term of the Amtrak Lease, Amtrak will notify Tenant of its desire to dispose of some or all of the Amtrak Property." DIBC argues that this language ties DIBC's option to purchase the Amtrak property to the duration of Expressway's option to purchase that property.

This argument is not persuasive. The first sentence of paragraph 19(a) of the Crown-Expressway lease specifically defines the "Tenant's Option" as the option Expressway is negotiating with Amtrak for the purchase of the Amtrak property. The second sentence of paragraph 19(a) then describes the Tenant's Option, stating that Amtrak will notify Expressway in the event that Amtrak wishes to sell the Amtrak property. The third sentence of paragraph 19(a) defines the "Landlord's Option" as the option DIBC will have in the event that Expressway decides to exercise the Tenant's Option and purchase the Amtrak property. Given this language, the third sentence of paragraph 19(a) describes the terms of the option that DIBC holds pursuant to the Crown-Expressway lease — not the second sentence of paragraph 19(a). No language in paragraph 19(a) refers to the duration of the Landlord's Option. Rather, the second sentence of paragraph 19(a) is a characterization of the Tenant's Option for the purposes of context.

## III.

In sum, nothing in the Crown-Expressway lease distinguishes it from the lease at issue in *Glocksine* and other relevant Michigan cases. The option, therefore, expired with the lease on June 30, 2003. In the absence of a contractual right, DIBC cannot maintain its claims. Accordingly, we **AFFIRM** the denial of reconsideration and the underlying grant of summary judgment.