NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0122n.06

Case Nos. 17-2305/2379

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 14, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| OLDNAR CORPORATION, a Michigan Corporation, fka Nartron Corporation, Identified on Initiating Document as, Gen X Microsystems, Inc., | ) ) ) ) ) | |
| Plaintiff-Appellant/Cross-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| PANASONIC CORPORATION OF NORTH AMERICA, a Delaware Corporation, dba Panasonic Automotive Systems Company of America; SANYO NORTH AMERICA CORPORATION, a Delaware Corporation, | ) ) ) ) ) ) | |
| Defendants-Appellees/Cross- Appellants. | ) ) | |

**BEFORE:  SUHRHEINRICH, MOORE, and BUSH, Circuit Judges.**

**JOHN K. BUSH, Circuit Judge.**  This is a case brought by Oldnar Corporation (formerly known as Nartron Corporation) ("Nartron")[1] against Sanyo North America Corporation ("Sanyo") and Panasonic Corporation of North America ("Panasonic") concerning touchscreen technologies used in motor vehicle dashboards.  Nartron appeals three of the district court's orders that collectively granted (1) summary judgment to Sanyo on Nartron's breach-of-contract claim, and

---

[1] Oldnar Corporation refers to itself as Nartron in its briefing, so we will do the same.

(2) summary judgment or judgment of dismissal in favor of both Sanyo and Panasonic on Nartron's unjust enrichment claims. Panasonic and Sanyo (collectively "Cross-Appellants") cross appeal the district court's denial of their motion to amend their pleadings to add a counterclaim.

For the reasons that follow, we (1) affirm the district court's summary judgment for Sanyo on the breach-of-contract claim with respect to sections 5.1 and 5.2 of the contract at issue, known as the Development and Supply Agreement ("DSA"); (2) reverse the district court's summary judgment for Sanyo on the breach-of-contract claim with respect to section 9.3 of the DSA; (3) affirm in part and reverse in part the district court's summary judgment for Sanyo on unjust enrichment; (4) reverse the district court's summary judgment for Panasonic on unjust enrichment; and (5) affirm the district court's denial of Cross-Appellants' motion for leave to amend their pleadings to add a counterclaim.

## FACTS AND PROCEDURAL HISTORY[2]

Around March 2008, Sanyo approached Nartron for help in developing a touchscreen technology that Sanyo could, in turn, sell to General Motors ("GM"). Nartron was known for having developed a Smart Touch® system to use in touchscreen interfaces. Because of Nartron's reputation and "know-how" in the industry, Sanyo asked for Nartron's assistance to secure a contract for GM's "CUE" system in Cadillacs. Obtaining GM's business for the Cadillac CUE technology was "vital for SANYO to win," or Sanyo risked leaving the supply-base industry for touch integrated centerstacks ("ICS"). R. 319, PageID 4488.

**The Development and Supply Agreement**. Nartron and Sanyo negotiated and executed the DSA, under which Nartron and Sanyo agreed to work together to develop touchscreen consoles using Intellectual Property of both Nartron and Sanyo. The DSA broadly defines "Intellectual

---

[2] We consider the facts in the light most favorable to Nartron, the party against whom summary judgment was granted. *See B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 598 (6th Cir. 2001).

Property" in section 1.3 as "know-how, one or more patents, trade secrets, and non-patentable inventions." R. 32-2, PageID 291.[3]  In addition, the DSA specifies that each party would maintain ownership of and protect its Intellectual Property: see, for example, sections 8.1 and 9.2 of the DSA.  Section 8.1 underscores that Intellectual Property "in existence prior to the date of this Agreement shall remain the property of the disclosing party."  *Id.* at 295.  As explained more fully below, Intellectual Property that pre-dates the DSA is considered to be part of "Existing Property Rights," as defined in section 1.11 of the DSA.  Intellectual Property created after the DSA's execution is not considered to be part of Existing Property Rights but instead is considered to be part of "New Property Rights," as referenced in both section 1.12 and section 9.2.[4]

The parties also agreed to provisions under the DSA governing the execution of, and compensation under, a "Product Agreement."  Section 5.1 explains the nature of that latter agreement in the event that Sanyo designates Nartron as the manufacturer or supplier of the capacitive touchscreen system for GM, while Section 5.2 provides that if Sanyo does not designate Nartron as the manufacturer or supplier, Nartron would license its Intellectual Property to Sanyo. Section 5.2 also specifies that "[u]nless otherwise defined in a product agreement[,] the license is at 10% of the 'Lead Parties System' sale price to a customer of the 'Parties System' or any variants made."  *Id.* at 293.

---

[3] The DSA uses capitalization inconsistently for the defined terms "Intellectual Property" and "Product Agreement," by sometimes referring to these terms using all lower-case letters, and sometimes capitalizing the first letter of each word.  We read the DSA, as do the parties, to apply the same meaning to these defined terms regardless of whether capitalization is used.

[4] As explained below, the description of New Property Rights in section 9.2 is somewhat inconsistent with the definition of New Property Rights in section 1.12, but we need not resolve that inconsistency to decide this appeal. *See infra* Part I.B.2.

The DSA further provides that, for the duration of the agreement, a party may not use the other party's Intellectual Property without the other party's consent. In this regard, section 9.3 states:

> Except as specifically authorized in this DSA, neither Party may use Existing Property Rights or New Property Rights belonging to the other Party without the prior written consent of the other Party in a separate license agreement and the payment of any royalty or other fees set forth in that license agreement as identified in the Product Agreement.

*Id.* at 299. And section 9.1 confirms that Existing Property Rights remain the property of a disclosing party when a Product Agreement is signed and that a party "will only be entitled to use Existing Property Rights in connection with Product Agreements." *Id.* at 296.

**Development of the Prototype for GM**. After Nartron and Sanyo executed the DSA, they jointly developed a working prototype that they both presented to GM in July 2009. Sanyo's witnesses confirmed that Nartron provided Sanyo several components in the final prototype, including information about which circuits and chips could work in a capacitive touch system. According to Nartron, its "know-how" enabled "Sanyo to overcome numerous challenges associated with implementing capacitive touch technology in an automotive ICS. Sanyo had benchmarked [its competitors], yet none of these suppliers was able to provide a quality prototype, because none of them possessed Nartron's know-how." R. 319, PageID 4493. Nartron claims that without its involvement, Sanyo would not have been able to make the prototype presented to GM.

Nonetheless, the parties never jointly executed a Product Agreement to cover the project. In 2009, during the product development period, Nartron sent Sanyo a Product Agreement, but Sanyo never signed it even though it continued to rely on Nartron for assistance and expertise.

Sanyo did respond to a price quote to cover the prototype's costs, which Nartron had submitted along with the Product Agreement. A month after receiving the Product Agreement and price quote, Sanyo issued a Purchase Order to Nartron to match the price Nartron had quoted.

The next relevant exchange of documentation occurred in September 2009, when Nartron sent Sanyo the invoice for the price quote it sent to Sanyo in April of that year. The invoice expressly disclaimed: "Notwithstanding any term in buyer's purchase order, or other documents of buyer to the contrary, buyer shall acquire <u>no</u> interest in any proprietary design or other intellectual property of seller evident in the goods applied [*sic*] by seller pursuant to buyer's order." R. 274-3, PageID 3872. A month later, Sanyo paid that invoice. While this payment covered some costs associated with Nartron's product development for Sanyo, it did not reflect any royalty fee associated with using Nartron's expertise and know-how to develop the prototype for GM.

Sanyo's next move, in November 2009, was to inform Nartron that it would not be using Nartron's chip because of costs. Instead, Sanyo would use a chip from a third-party supplier. Nartron anticipated that Sanyo would use third-party suppliers for some of the costly components, but it did not expect that Sanyo would refuse to pay a royalty fee for the Intellectual Property it used to develop the prototype. Thus, Nartron sued to recover royalty fees it claims it is owed under the DSA.

The original complaint, filed in late 2013, alleged a breach-of-contract claim, an unjust enrichment claim, and a breach of fiduciary duty claim against Sanyo. Nartron later amended its complaint to remove the fiduciary duty claim, and amended the pleading a second time to add an unjust enrichment claim against Panasonic.

After the close of discovery, the district court issued three opinions that are now under our review. First, on cross-motions for summary judgment, the district court granted summary

judgment for Sanyo on the unjust enrichment claim and on the breach-of-contract claim that was based on Nartron's theory of recovery under sections 5.1 and 5.2 of the DSA. Second, on the eve of trial, the district court delivered a bench ruling that granted summary judgment to Sanyo on the breach-of-contract claim based on Nartron's theory of recovery under section 9.3 of the DSA. Third, the district court concluded, following the bench ruling, and after further briefing from both parties, that Panasonic was "entitled to dismissal and/or summary judgment" on the unjust enrichment claim. R. 376, PageID 6063. In the same decision, the district court denied Cross-Appellants' motion for leave to amend their pleading to add a counterclaim.

## **DISCUSSION**

### I.

### *A. Standard of Review*

This court reviews a district court's decision to grant summary judgment de novo.[5] *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 405 (6th Cir. 2004). Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a material fact is a "genuine issue" only if a reasonable jury could find for the nonmoving party on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, this court reviews factual issues in favor of the party whose motion did not prevail in the district court—here, Nartron. *See B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 598 (6th Cir. 2001).

---

[5] At oral argument, both parties agreed that the summary judgment standard of review applies to each of the district court's decisions at issue here with the exception of the decision denying Cross-Appellants leave to amend their pleadings to add a counterclaim. Oral Argument at 27:57–59 (Sanyo & Panasonic), 34:10–12 (Nartron).

For summary judgment in breach-of-contract cases, there is "[a] special interpretive framework" that applies:

> A contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity. If the court finds no ambiguity, it should proceed to interpret the contract—and it may do so at the summary judgment stage. If, however, the court discerns an ambiguity, the next step—involving an examination of extrinsic evidence—becomes essential. Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations.

*United Rentals*, 355 F.3d at 406 (ellipses and citations omitted).

B. *Nartron's Breach-of-Contract Claim Against Sanyo*

"Because this is a diversity action in a matter filed in a Michigan district court, the substantive law of Michigan applies." *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) (citations omitted).[6] When interpreting a contract under Michigan law, our primary charge "is to ascertain and enforce the intent of the parties." *Id.* (citations omitted); *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005). The court examines the contract as a whole, giving effect to all its parts, and reviews the language of the written agreement according to its "ordinary and natural meaning." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001). Also, "contracts must be construed consistent with common sense and in a manner that avoids absurd results," *Kellogg Co. v. Sabhlok*, 471 F.3d 629, 636 (6th Cir. 2006) (citation omitted), and we must "avoid an interpretation that would render any part of the contract surplusage or

---

[6] Both parties agree, and the DSA states, that Michigan contract law applies.

nugatory," *Iroquois on the Beach, Inc. v. General Star Indemnity Co.*, 550 F.3d 585, 588 (6th Cir. 2008) (citation and internal quotation marks omitted).

Under Michigan law, "[i]f the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Tr.*, 745 N.W.2d 754, 758 (Mich. 2008) (citing *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999)). A contract is ambiguous "if its language is reasonably susceptible to more than one interpretation," *Cole v. Ladbroke Racing Michigan, Inc.*, 614 N.W.2d 169, 176 (Mich. Ct. App. 2000) (citation omitted), or "if two provisions of the same contract irreconcilably conflict with each other," *Klapp v. United Insurance Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). That the parties dispute the meaning of a contract does not make the agreement ambiguous. *Cole*, 614 N.W.2d at 176. But if the contract is ambiguous, "extrinsic evidence can be presented to determine the intent of the parties." *Smith Tr.*, 745 N.W.2d at 758 (citing *New Amsterdam Cas. Co. v. Sokolowski*, 132 N.W.2d 66, 68 (Mich. 1965)).

> 1. *The district court properly concluded that, without a Product Agreement, Nartron cannot recover a royalty or licensing fee under sections 5.1 and 5.2 of the DSA.*

Nartron asserts the district court erred by holding that sections 5.1 and 5.2 of the DSA preclude Nartron from recovering "a 10% royalty rate for all Sanyo's sales of this system [*i.e.*, the "Lead Parties System"]." Appellant/Cross-Appellee Br. at 36–37. We are not persuaded by Nartron's argument. We affirm the district court's conclusion that sections 5.1 and 5.2 unambiguously preclude Nartron from recovering a royalty under those provisions without a separately executed Product Agreement.

Section 5.2 states in relevant part: "Unless otherwise defined in a product agreement[,] the license is at 10% of the 'Lead Parties System' sale price to a customer of the 'Parties System' or any variants made." R. 32-2, PageID 293. The "license" referred to in this clause is a license to

use "all industrial and intellectual property owned by the Party that is necessary for the Party to make or have made such Product(s)." *Id.* Read together, these sentences require the parties to license the needed Intellectual Property to make the "Products,"[7] and the applicable license fee for that license will be 10% of the "Lead Parties System" sale price to a customer of the "Parties System" unless there is a fee defined in a Product Agreement. *See id.* But, regardless of how the license fee is determined, the DSA requires a Product Agreement before any license fee must be paid under sections 5.1 and 5.2.

A Product Agreement is necessary for Sanyo to have to pay a license fee by virtue of the operation of both provisions. Section 5.1 makes clear that a "Parties System," as defined in that section and also referred to in section 5.2, requires a Product Agreement:[8] "Nartron or Sanyo shall be designated as a Preferred Supplier (Seller) or Lead Party (Buyer) for each Product Agreement that is incorporated into an Original Equipment Manufacturer component, sub-system or system to be sold by the Parties to an Original Equipment Manufacturer (hereafter a 'Parties System')." *Id.* at 293. Therefore, absent a Product Agreement, there is no "Parties System," and by extension, when there is no "Parties System," there can be no "sale price to a customer" on which the 10% license fee can be set. Accordingly, Nartron cannot recover under (and Sanyo, in turn, cannot breach) section 5.2 without a Product Agreement.

Moreover, we conclude that the relevant language in section 5.2 "is [not] reasonably susceptible to more than one interpretation," *Cole*, 614 N.W.2d at 176 (citation omitted), and therefore is unambiguous under Michigan law. Accordingly, no extrinsic evidence may be presented by either party to elucidate the intent of the parties and the meaning of these terms.

---

[7] Section 1.8 of the DSA defines Products as "Products individually identified in Product Agreements that shall define the scope, business objectives and responsibilities of the Parties." R. 32-2, PageID 291.

[8] For this same reason, section 5.1 does not allow Nartron to recover licensing fees as of right without a Product Agreement.

Therefore, we **AFFIRM** the district court's holding that sections 5.1 and 5.2 unambiguously do not allow Nartron to recover license fees or a royalty under those provisions without a Product Agreement.

>   2. *The district court erred in granting summary judgment on Nartron's breach-of-contract claims against Sanyo under section 9.3 of the DSA.*

Nartron also argues that the district court erred by concluding that section 9.3 does not allow Nartron to recover without a Product Agreement. As to this argument, we agree with Nartron. As explained below, the right of recovery under section 9.3 for the unauthorized use of Intellectual Property is not defeated by the absence of a Product Agreement. In fact, the right of recovery turns, in part, on whether written consent for the use of Intellectual Property has been given in a Product Agreement. Thus, rather than defeat a claim under section 9.3, the non-existence of a Product Agreement supports the claim because its non-existence is proof that written consent for the use of Intellectual Property was never given.

To explain our reasoning, we turn to section 9.3, which states as follows:

> 9.3 Use of Property Rights
> Except as specifically authorized in this DSA, neither Party may use Existing Property Rights or New Property Rights belonging to the other Party without the prior written consent of the other Party in a separate license agreement and the payment of any royalty or other fees set forth in that license agreement as identified in the Product Agreement. For the purpose of clarification, notwithstanding anything contrary herein, Nartron is not authorized to use any intellectual property rights owned by SANYO's parent or other affiliated companies unless otherwise authorized in a separate license agreement and SANYO is not authorized to use any intellectual property rights owned by Nartron's parent or other affiliated companies unless otherwise authorized in a separate license agreement.

R. 32-2, PageID 299. The focus of our analysis is on the first sentence of this provision and its prohibition of the unauthorized use of Existing Rights and New Property Rights.[9]

---

[9] Nartron argues that the second sentence of section 9.3 independently allows it to recover for the unauthorized use of its Intellectual Property. This sentence, however, precludes the unauthorized use of Intellectual Property owned not by Nartron itself but rather by any of Nartron's "*parent or other affiliated companies*." R. 32-2, PageID 299 (emphasis

Section 1.11 defines Existing Property Rights as "intellectual property rights of each party which was [*sic*] created outside the scope of this DSA and Product Agreement." *Id.* at 292. As noted, Intellectual Property is broadly defined by section 1.3 as "know-how, one or more patents, trade secrets, and non-patentable inventions." *Id.* at 291. At a minimum, Existing Property Rights include Intellectual Property created before the parties executed the DSA. This meaning is consistent with the parties' express intent that they "wish[ed] to utilize Intellectual Property" from one another. *Id.* Indeed, Cross-Appellants also shared this understanding by stating that section 9.3 "acknowledges the pre-existing property rights"—i.e., the property rights each party owned before executing the DSA. Appellees/Cross-Appellants Br. at 28. And lastly, we note the parties' use of the past perfect tense of the verb "create." R. 32-2, PageID 292. This usage, when juxtaposed against the definition of New Property Rights in section 1.12, informs us that Existing Property Rights include those rights that pre-date the DSA.

The meaning of "New Property Rights" is a more complicated issue. "New Property Rights," according to section 1.12, are "intellectual property rights which is [*sic*] developed under the scope of this DSA and Product Agreement." *Id.* The ordinary and natural meaning of this language suggests that the existence of a Product Agreement is necessary for any Intellectual Property to be classified as New Property Rights. That is because, in section 1.12 (as in section 1.11), the conjunction "and" is used between "DSA" and "Product Agreement," which indicates that the scope under which Intellectual Property is created to qualify as New Property Rights must include a Product Agreement in addition to the DSA.

This interpretation—which requires a Product Agreement to exist before New Property Rights can be created—has the virtue of consistency with the text of section 1.12. But, this reading

---

added). Nartron has not explained how any of the know-how at issue is owned by its parent or other affiliated companies.

is also problematic, as it appears to be in conflict with another provision of the DSA—namely section 9.2. *See id.* at 296–97. Section 9.2 also purports to establish how New Property Rights can be created after the DSA is executed. Notably, there is no mention of the necessity of a Product Agreement for the creation of New Property Rights in section 9.2(a). Instead, section 9.2(a) provides that "[e]ach Party will inform the other Party about any invention or discovery resulting in a New Property Right that has been developed by its agents or employees and *covered by the scope of this DSA* promptly after that New Property Right has been developed." *Id.* at 296 (emphasis added). Thus, according to the ordinary and natural meaning of section 9.2, the parties created a framework through which New Property Rights can be developed simply by being covered by the scope of the DSA regardless of whether a Product Agreement exists.

The way in which the term New Property Rights is used in section 9.2, with no reference to a Product Agreement, is inconsistent with the definition of New Property Rights in section 1.12, which requires the existence of a Product Agreement for New Property Rights to be created. To be sure, there is a slight difference in the operative wording of section 9.2, which uses the phrase "covered by the scope of this DSA", and section 1.12, which employs the words "under the scope of this DSA." But we discern no meaningful difference between these phrases. Thus, the requirement of section 1.12 that New Property Rights must be created under both the DSA *and* a Product Agreement conflicts with section 9.2, which requires only a DSA (and not a Product Agreement) as a precondition for New Property Rights to exist.

Finding an alternative interpretation of section 1.12 that preserves section 9.2 also has its difficulties. To avoid construing section 1.12 in a manner that does not conflict with section 9.2, section 1.12 would need to be interpreted in a way that allows for the development of New Property Rights under the scope of the DSA *without* a Product Agreement. That would require us to excise

12

the words "and Product Agreement" from section 1.12. And, alternatively, if we were to try to make section 9.2 consistent with section 1.12, we would have to add the words "and Product Agreement" after "covered by the scope of this DSA." We discern no principled basis to choose which provision should be altered to make section 1.12 and 9.2 consistent, and therefore deem the conflict between their respective approaches to create ambiguity as to the meaning of New Property Rights. It is simply unclear from the contractual words whether the parties intended to require a Product Agreement in order for New Property Rights to exist. *See Klapp*, 663 N.W.2d at 453; *Delong v. Raymer*, No. 237476, 2003 WL 21977238, at *3 (Mich. Ct. App. Aug. 19, 2003) (per curiam); *see also Cain Rest. Co. v. Carrols Corp.*, 273 F. App'x 430, 433–35 (6th Cir. 2008). As to this ambiguity, therefore, the parties should be allowed to present extrinsic evidence of contractual meaning if resolution of the definition of New Property Rights is required on remand. *See Smith Tr.*, 745 N.W.2d at 758.

But we need not decide the meaning of New Property Rights to decide this appeal. That is because, regardless of how New Property Rights are defined, Nartron has sufficient evidence for a reasonable jury to find that Sanyo used Nartron's Intellectual Property in violation of section 9.3.

Remember, section 9.3 is concerned with recovery for the unauthorized use of not just New Property Rights. This provision also permits Nartron's recovery for Sanyo's unauthorized use of Nartron's Existing Property Rights. Thus, as long as Nartron proves that Sanyo used its Intellectual Property as defined in section 1.3 without the written consent specified in section 9.3, it does not matter whether that property is classified as Existing Property Rights or New Property Rights: both categories are protected by section 9.3.

The district court concluded (and Sanyo and Panasonic argue on appeal), however, that the wording of section 9.3 provides protection for Existing Property Rights only if a licensing

agreement exists that has been identified in a Product Agreement. *See* R. 335, PageID 5283 ("Section 9.3 of the DSA unambiguously explains the parties' right to keep and use Existing Property Rights, to the extent that there are any, is not covered by the DSA unless expressly made the subject of a separate licensing agreement identified in a Product Agreement.") Echoing the district court's conclusion, Sanyo and Panasonic argue that "[i]n the absence of a Product Agreement, § 9.3 simply operates as a 'carve out' provision; it acknowledges the parties' pre-existing property rights, and specifically segregates such rights from the terms of the DSA." Appellees/Cross-Appellants Br. at 28.

The error with Sanyo and Panasonic's logic, as well as the district court's reasoning, is that they overlook the principal thrust of section 9.3: "neither Party *may use* Existing Property Rights or New Property Rights belonging to the other Party *without the prior written consent of the other Party*." R. 32-2, PageID 299 (emphases added).

Under section 9.3, each party's authority to use the other party's Existing or New Property Rights requires the prior written consent of the party that owns those rights. Section 9.3 specifies that the required prior written consent must be given in a specific form: "a separate license agreement and the payment of any royalty or other fees set forth in that license agreement as identified in the Product Agreement." *Id.* Thus, to obtain the consent of the other party to use its Intellectual Property, there must exist both "a separate license agreement" and a "Product Agreement" that identifies "that license agreement" and "set[s] forth" the "royalty or other fees" to be paid. And section 9.1 reiterates that for written consent to exist, it must be embodied in a Product Agreement: "The other Party will only be entitled to use Existing Property Rights *in connection with Product Agreements* and the sale and marketing of Parties Systems (a) *resulting*

14

*from Product Agreements*, and (b) containing components manufactured by the Parties to this Agreement." *Id.* at 296 (emphases added).

To be sure, neither party necessarily breaches the DSA simply by failing to execute a Product Agreement and a licensing agreement. However, a party breaches the DSA, specifically section 9.3, when it uses Existing Property Rights or New Property Rights of the other party and that use is not (1) "specifically authorized in . . . [the] DSA," or (2) is not with "the prior written consent of the other party" in the form of a separately executed Product Agreement and a separately executed license agreement, as specified by section 9.3. *Id.* at 299. Sanyo has not offered any reason to conclude that it had any specific authorization in the DSA to use Nartron's Intellectual Property without Nartron's prior written consent under section 9.3, and it is undisputed that no Product Agreement or licensing agreement exists. Thus, any use that Sanyo made of Nartron's Intellectual Property (regardless of whether it is classified as Existing Property Rights or New Property Rights) was in violation of section 9.3.

We therefore **REVERSE** district court's grant of summary judgment to Sanyo on the breach-of-contract claim based on section 9.3 and **REMAND** for determination of what Intellectual Property owned by Nartron, if any, was used by Sanyo in violation of section 9.3, and if such usage was made by Sanyo, the award of damages to Nartron for the unauthorized use.[10] Although the DSA does not specify the specific recovery for breach of section 9.3, "[t]he remedy for breach of contract is to place the nonbreaching party in as good a position as if the contract had been fully performed." *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278, 280 (Mich. 1996) (citing *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 52–53 (Mich. 1980)). Because the district

---

[10] It is not immediately apparent why it would be necessary to delineate between Existing Property Rights and New Property Rights on remand, but if so, the district court should consider extrinsic evidence to ascertain the parties' intent as to whether a Product Agreement is necessary to create New Property Rights.

court has not determined the appropriate measure of damages that Nartron might be able to recover for a breach of section 9.3 of the DSA, we decline to do so here. *See Maldonado v. Nat'l Acme Co.*, 73 F.3d 642, 648 (6th Cir. 1996).

II.

Nartron's Unjust Enrichment Claims

We now turn to Nartron's unjust enrichment claims against Sanyo and Panasonic. We first address the district court's conclusion that Nartron cannot recover under a theory of unjust enrichment because of the existence of the DSA. We then address the district court's conclusion that Michigan's Uniform Trade Secret Act displaced Nartron's unjust enrichment claims.

A. *The district court erred by concluding that Nartron cannot recover under a theory of unjust enrichment because of the existence of the DSA.*

Establishing an unjust enrichment claim under Michigan law requires "(1) the defendant's receipt of a benefit from the plaintiff and (2) an inequity to [the] plaintiff as a result." *AFT Mich. v. Michigan*, 846 N.W.2d 583, 590 (Mich. Ct. App. 2014) (citing *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991)). Under an unjust enrichment theory of recovery, the court implies a contract to prevent a party from inequitably receiving a benefit from another. *See Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 903 (Mich. Ct. App. 2006). "[A] contract will be implied only if there is no express contract covering the same subject matter." *Landstar Express Am., Inc., v. Nexteer Auto. Corp.*, 900 N.W.2d 650, 656 (Mich. Ct. App. 2017) (quoting *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003)).

If there is a valid enforceable contract "between the same parties on the same subject matter," a plaintiff may not recover under a theory of unjust enrichment. *Id.* (emphasis omitted) (quoting *Morris Pumps*, 729 N.W.2d at 903). "Where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and

16

unjust enrichment." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 181 (6th Cir. 1996) (citation omitted). Stated another way, "a contract cannot be implied in law while an express contract covering the same subject matter is in force between the parties." *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.*, 595 N.W.2d 176, 188 (Mich. Ct. App. 1999) (citations omitted).

However, this prohibition on recovering under unjust enrichment does not apply when the contract is no longer in force. *See id.* ("In the present case, the trial court could have found that an express contract was originally formed between the parties but that subsequently the contract was no longer in force. Under such circumstances, plaintiff could have recovered for breach of contract for the period when the contract was in force and could have recovered on an implied contract basis for the period when there was no contract in force."). Thus, it is necessary to bear in mind when the contract at issue here—the DSA—was no longer in force.

According to the DSA, the term of the Agreement "shall be the greater of four years[] or the latest completion date of any Product Agreement, unless modified or terminated by written mutual consent by the Parties." R. 32-2, PageID 295. Because none of the conditions were met to extend the duration greater than four years, the DSA expired on April 2, 2012, so there was no contract in force between Nartron and Sanyo from that date onward.

With these relevant facts and the governing law in mind, we hold, as explained below, that the district court erred in dismissing Nartron's unjust enrichment claims.

As for the unjust enrichment claim against Sanyo, it is barred under Michigan law if, as noted, the subject matter of the claim is already redressable through a breach-of-contract claim. *See Landstar Express Am., Inc.*, 900 N.W.2d at 656. Because Nartron has a viable breach-of-contract claim against Sanyo, Nartron's unjust enrichment claim against Sanyo is barred for those

injuries already redressable by the breach-of-contract claim. However, Nartron's breach-of-contract claim against Sanyo extends only up to April 2, 2012, when the DSA expired. Sanyo then merged with Panasonic on March 31, 2015. Under *H.J. Tucker & Associates*, Nartron has a viable unjust enrichment claim to recover any damages that it may have against Sanyo for the time from April 3, 2012, to March 31, 2015. *See* 595 N.W.2d at 188.

Therefore, as to Nartron's unjust enrichment claim against Sanyo, we **AFFIRM IN PART** (because Nartron has a viable breach-of-contract claim, up to April 2, 2012) and **REVERSE IN PART** (because Nartron could recover damages for unjust enrichment between April 3, 2012, and March 31, 2015).

Regarding Nartron's unjust enrichment claim against Panasonic, the district court also erred by concluding that Panasonic was entitled to summary judgment based on the existence of the DSA. The district court reasoned that, as to unjust enrichment, Panasonic was entitled to summary judgment for the same reason that it concluded Sanyo was entitled to summary judgment: "Nartron presented no credible evidence that the product development at issue falls outside the expressed scope of the parties' DSA, in which Nartron's role and resources are broadly stated." R. 376, PageID 6059. Thus, the district court concluded that "Nartron's failure to show it was entitled to compensation under the DSA provisions does not default into a viable unjust enrichment claim." *Id.*

The district court, however, erred in its conclusion that Nartron had failed to present evidence that its claims fell "outside the expressed scope of the parties' DSA." *Id.* By virtue of the DSA's expiration, Nartron's unjust enrichment claims against Panasonic necessarily fell outside the scope of the DSA because the agreement was no longer in force when Panasonic committed its alleged post-merger wrongful acts. *See H.J. Tucker & Assocs.*, 595 N.W.2d at 188.

18

We further note that to the extent that any of Panasonic's pre-merger activity was wrongful and took place before the DSA expired, the DSA also presents no obstacle to Nartron's ability to recover under unjust enrichment. Before the DSA expired, Panasonic was not a party to the DSA because, even though Panasonic later merged with Sanyo, Panasonic remained a free-standing corporate entity liable for its own actions. Mich. Comp. Laws § 450.1724(1)(d).

We therefore **REVERSE** the district court's holding that Panasonic was entitled to summary judgment on the unjust enrichment claim based on the existence of the DSA.

B. *The district court erred by concluding that Michigan's Uniform Trade Secrets Act displaced Nartron's unjust enrichment claims.*

The district court concluded, "to the extent Nartron's claims are based on the alleged misuse of Nartron's capacitive touch intellectual property, i.e., Nartron's 'Smart Touch' technology and/or technology related thereto, . . . such claims are barred by Michigan's Uniform Trade Secrets Act ('MUTSA')." R. 376, PageID 6060. The district court noted that it was "not clear what specific 'know-how, information and technology' Nartron reference[d]. But in any event, 'the disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by MUTSA.'" *Id.* (quoting *Konica Minolta Bus. Sols. U.S.A., Inc. v. Lowery Corp.*, No. 15-11254, 2016 WL 6828472, at *6 (E.D. Mich. Nov. 18, 2016)).

Cross-Appellants defend the district court's ruling by arguing on appeal that MUTSA displaces Nartron's unjust enrichment claims because "Nartron's unjust enrichment claims are based on the alleged misappropriation of its capacitive Smart Touch® technology and/or related know-how." Appellees/Cross-Appellants Br. at 36. Cross-Appellants further contend that "the breadth of claims displaced by MUTSA is not limited to trade secrets." *Id.* at 37. For the reasons explained below, we are not persuaded by Cross-Appellants' arguments because they run afoul of

MUTSA's express language and conflict with Michigan courts' interpretation of the relevant MUTSA provisions. *See, e.g.*, *Planet Bingo, LLC v. VKGS, LLC*, 900 N.W.2d 680 (Mich. Ct. App. 2017).

The displacement provision of MUTSA states:

> (1)    Except as provided in subsection (2), this act displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
>
> (2)    This act does not affect any of the following:
>
>     (a)    Contractual remedies, whether or not based upon misappropriation of a trade secret.
>
>     (b)    Other civil remedies that are not based upon misappropriation of a trade secret.
>
>     (c)    Criminal remedies, whether or not based upon misappropriation of a trade secret.

Mich. Comp. Laws § 445.1908. MUTSA also defines "Trade secret" as:

> [I]information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
>     (i)    Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
>     (ii)    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 445.1902(d).[11]

After considering these provisions, the Michigan Court of Appeals in *Planet Bingo* concluded that "MUTSA does not preempt *all* common-law unfair-competition claims." 900 N.W.2d at 688. Instead, MUTSA preempts only those claims "based on misappropriation of 'trade secrets' as defined by MUTSA." *See id.*; *cf. Indus. Control Repair, Inc. v. McBroom Elec. Co.*, No. 302240, 2013 WL 5576336, at *7 (Mich. Ct. App. Oct. 10, 2013) ("To sustain a claim under MUTSA, it is incumbent on the plaintiff to identify with specificity the 'trade secret'

---

[11] We note that MUTSA separately defines "misappropriation," but it is not relevant to this appeal. *See* Mich. Comp. Laws § 445.1902(b).

allegedly misappropriated." (citation omitted)). Thus, displacement under MUTSA hinges on the "status" of the information at issue in the plaintiff's civil action and whether it satisfies this definition. *See Planet Bingo*, 900 N.W.2d at 684, 688 (holding one of plaintiff's claims barred because "the breadth of the definition of 'confidential information'" in the contract met MUTSA's "misappropriation" and "trade secret" definitions).

Based on this authority, we conclude that the district court erred when it held that Nartron's claims are barred by MUTSA without determining whether the "know-how" that Nartron alleges Panasonic derived an unjust benefit from, actually satisfied MUTSA's "trade secret" definition. The district court concluded that "[i]t is not clear what specific 'know-how, information and technology' Nartron references" and reasoned that "the disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by MUTSA." R. 376, PageID 6060 (internal quotation omitted) (quoting *Konica Minolta Bus. Sols.*, 2016 WL 6828472, at *6). As explained above, MUTSA's displacement provisions, in fact, do hinge on the "status" of the information in a plaintiff's civil action and, because the district court did not make this determination, we now **REVERSE** and **REMAND** its decision for further consideration.

On remand, the district court is to determine whether Nartron's alleged "know-how" satisfies MUTSA's definition of "trade secret." In determining whether the "know-how" satisfies the definition, the district court is also to consider the parties' relevant agreements. *See Planet Bingo*, 900 N.W.2d at 684–85, 688. If the "know-how" falls in the definition of trade secret under MUTSA, then the unjust enrichment claims would be displaced by MUTSA and should be dismissed. If the "know-how" falls outside the trade secret definition, then MUTSA is no bar to Nartron's recovery.

> *C. Nartron's assertion that Cross-Appellants waived their MUTSA defense should be reconsidered on remand.*

Nartron also argued that Cross-Appellants waived their MUTSA affirmative defense on the basis that they did not plead this defense as required by Federal Rule of Civil Procedure 8(c). We recognize that the parties have briefed the issue for our review, but because the district court has not addressed this issue, we also decline to address it here. *See Maldonado*, 73 F.3d at 648. Indeed, waiting another day to decide this issue would be prudent because, on remand, the district court might determine that none of the information at issue in Nartron's unjust enrichment claims is subject to MUTSA's displacement provision. Should that happen, there would be no need to consider Nartron's waiver argument. Thus, assuming Nartron raises its waiver argument on remand, the district court should have the first opportunity to address it.

III.

Sanyo and Panasonic's Cross-Appeal

Cross-Appellants argued in their cross-appeal that the district court erred by denying them leave to amend their pleadings to add a counterclaim. We conclude that the district court acted within its discretion.

This court "review[s] the denial of a motion to amend under the abuse-of-discretion standard, 'unless the motion was denied because the amended pleading would not withstand a motion to dismiss, in which case the standard of review is de novo.'" *Beydoun v. Sessions*, 871 F.3d 459, 464 (6th Cir. 2017) (alteration in original) (quoting *Colvin v. Caruso*, 605 F.3d 282, 294 (6th Cir. 2010)). Here, this court reviews the denial of Cross-Appellants' counterclaim for abuse of discretion.

The Federal Rules of Civil Procedure generally allow a party to "amend its pleadings once as a matter of course." Fed. R. Civ. P. 15(a)(1). Otherwise, a party's pleadings may be amended

"only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Under the rules, the district court should freely grant leave when justice so requires. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458 (6th Cir. 2001). "When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Id.* at 459 (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)).

When deciding whether to grant a motion to amend, the district court should also consider "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citation omitted). However, "[d]elay, standing alone, is an insufficient basis for denying leave to amend, and this is true no matter how long the delay." *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 409 (6th Cir. 2000) (citation omitted). Notice and substantive prejudice to the opposing party are critical factors to determine whether an amendment should be granted. *See Wade*, 259 F.3d at 458–59 (citation omitted).

Panasonic argues that the district court abused its discretion by denying leave to amend its pleadings because its decision "was based exclusively on its conclusion that Defendants' [*sic*] had unduly delayed in bringing it." Appellees/Cross-Appellants Br. at 48. Were that true, the district court would have abused its discretion. However, as Cross-Appellants pointed out in their brief (and on the same page), the district court "denied the motion to amend on the basis that the addition of a counterclaim 'at this late stage of this case, after it is essentially concluded, would unduly prejudice Nartron.'" *Id.* (quoting R. 376, PageID 6063). Moreover, the district court's conclusion is buttressed by Panasonic's unsupported justification for seeking leave to amend its pleading as required by *Wade* when Panasonic sought leave following the close of discovery and on the eve

of trial. *See* 259 F.3d at 459. Because the district court concluded that Nartron would be prejudiced by the amendment and Panasonic's justifications for bringing the amendment in the late stage of the litigation are not supported by the record, the district court did not abuse its discretion.

Cross-Appellants advance two arguments to account for their delayed request to seek leave to amend its filings: (1) Nartron delayed the production of the Settlement Agreement because Nartron did not initially produce the Settlement Agreement as responsive to Cross-Appellants' requests; and (2) Nartron's owner and president, Norman Rautiola, allegedly deceived Cross-Appellants with false testimony that delayed production of the Settlement Agreement until the eve of trial. We are not persuaded by these reasons. Cross-Appellants admitted that they have had a copy of the Settlement Agreement since 2009, and the record supports that Cross-Appellants had the capacity to retrieve the Settlement Agreement.

We also cannot discern any falsehoods in the testimony presented for our review. Cross-Appellants point us to an excerpt of Rautiola's deposition as containing allegedly deceptive testimony. *See generally* R. 365; R. 368-5. Based on the question "Did Nartron license Quantum?" and a response of "No." from Rautiola, R. 365, PageID 5912, Defendants invite us to conclude that Rautiola "expressly denied that Nartron had licensed technology to Quantum as part of the 2007 settlement." Appellees/Cross-Appellants Br. at 49. After reviewing the quoted passage of the deposition transcript and the deposition testimony in its broader context, we are not persuaded. Based on the passage's context, there is nothing to suggest that the question concerned the terms of any settlement. Indeed, the previous question addressed the basis for Nartron's belief that its circuitry was in Atmel's custom chip. Based on the transcript text itself, we cannot make

the leap that Cross-Appellants ask us to take—that Rautiola's testimony pertained to whether there was a license as a part of the Settlement Agreement.

Cross-Appellants also rely on the following excerpt in support of their argument:

Q.  Just so that we have a clean record, as part of that litigation, Quantum provided Nartron with a patent related to closure technology and not capacitive touch center stacks.

A.  Right.  And then we withdrew our litigation, and that was the end of that.

R. 365, PageID 5913–14.  This testimony does not persuade us that Rautiola further insisted that "Quantum settlement encompassed only closure technology, not the capacitive touch technology at issue in this case."  Appellees/Cross-Appellants Br. at 49.  Instead, the testimony confirms only that part of the Settlement Agreement, not the entire Settlement Agreement, involved the assignment of the patent at issue.

Thus, we find that the reasons offered by Cross-Appellants to justify their delayed amendment are not supported by the record.  Further, the record supports the district court's conclusion that Nartron would be prejudiced by the proposed amended pleading.  The addition of the counterclaim would require additional discovery on a technological issue, and the principal individual with information who would testify about the relevant issues on behalf of Nartron has since passed away.  In view of the above, we **AFFIRM** the district court's decision to deny Cross-Appellants leave to amend their pleadings to add a counterclaim.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's summary judgment for Sanyo on Nartron's breach-of-contract claim with respect to sections 5.1 and 5.2 of the DSA; **REVERSE** the district court's summary judgment for Sanyo on Nartron's breach-of-contract claim with respect to section 9.3 of the DSA; **AFFIRM IN PART** and **REVERSE IN PART** the district court's summary judgment for Sanyo on Nartron's unjust enrichment claim; **REVERSE**

the district court's judgment for Panasonic on Nartron's unjust enrichment claim; **REVERSE** the district court's ruling that MUTSA bars Nartron's unjust enrichment claims; and **AFFIRM** the district court's denial of Cross-Appellants' motion for leave to amend their pleadings to add a counterclaim. The case is now **REMANDED** to the district court for further proceedings consistent with this opinion.